**DIRECTV, INC., et al., Petitioners/Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**MCI Telecommunications Corporation, et al., Intervenors.**

Nos. 96–1001, 96–1005, 96–1010 and 96–1011.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 1, 1996.

Decided April 18, 1997.

---

Lawrence S. Robbins, Washington, DC, argued the cause, for petitioners/appellants EchoStar Satellite Corporation, et al. With him on the briefs were H. Thomas Byron, III, Charles G. Cole and Philip L. Malet. William L. Fishman entered an appearance.

Maureen E. Mahoney, Washington, DC, argued the cause, for petitioner DIRECTV, Inc., with whom James H. Barker, III, and Gary M. Epstein were on the briefs.

Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission, argued the cause, for respondents/appellees, with whom William E. Kennard, General Counsel, Roberta L. Cook, Counsel, Stewart A. Block, Counsel, Anne K. Bingaman, Assistant Attorney General, U.S. Department of Justice, Catherine G. O'Sullivan and Nancy C. Garrison, Attorneys, were on the brief.

Bruce J. Ennis, Jr., Washington, DC, argued the cause, for intervenor MCI Telecommunications Corporation, with whom Anthony C. Epstein was on the brief.

Before: GINSBURG, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Before us are four consolidated petitions for review of the Federal Communications Commission's rules and regulations governing the distribution of Direct Broadcasting Satellite channels reclaimed from Advanced Communications Corporation. *See Revision of Rules and Policies for the Direct Broadcast Satellite Service, Report and Order,* 11 F.C.C.R. 9712 (1995) (*DBS Order*). Petitioners EchoStar Satellite Corporation, Directsat Corporation, and Direct Broadcasting Satellite Corporation (DBSC) challenge the Commission's decision to put up for competitive bidding certain DBS channels that the Commission reclaimed when it canceled a DBS permit held by Advanced Communications Corporation. The Commission had previously said that any reclaimed channels would be distributed pro rata among certain preexisting permittees, including the petitioners. The petitioners contend that the new auction rule is impermissibly retroactive, arbitrary and capricious, and without statutory authority. EchoStar, Directsat, and DIRECTV also contend that it is arbitrary and capricious for the FCC to require that the winning bidder at the auction divest itself of its existing DBS channels. DIRECTV also challenges as arbitrary and capricious the Commission's decision not to adopt a rule restricting the ability of cable system operators to participate in the auction. The Commission, in addition to opposing the petitioners' contentions on the merits, maintains that the petitioners lack standing to challenge the structural rules of the auction. MCI Telecommunications Corporation, a successful bidder at the auction, has intervened in support of the FCC.

We hold that the Commission's decision to adopt an auction rule was neither retroactive (let alone impermissibly retroactive), nor arbitrary and capricious, nor without statutory authority. In addition we hold that DIRECTV has standing to petition for review of the divestiture rule, but we deny its petition on the merits.

## I. BACKGROUND

DBS is a radio communication service that uses satellites in geostationary orbits to transmit multiple channels of video programming directly to 18–inch satellite dishes located at the premises of subscribers. Pursuant to an agreement among the nations of the Western Hemisphere, the United States has been allocated eight orbital locations for domestic DBS transmission. These are located at 61.5°, 101°, 110°, 119°, 148°, 157°, 166°, and 175° Western Longitude. Each orbital position contains 32 channels, each of which, with current technology, is capable of simultaneously transmitting from five to seven video programs. *See Revision of Rules and Policies for the Direct Broadcast Satellite Service, Notice of Proposed Rulemaking,* 11 F.C.C.R. 1297 ¶ 5 (1995) (*NPRM*). Only the 101°, 110°, and 119° W.L. orbital locations are capable of transmitting a "full-CONUS" signal, i.e., one that reaches the entire continental United States. The four U.S. orbital positions located at 148°, 157°, 166°, and 175° W.L. can be used to transmit to the western United States, and signals from the orbital position located at 61.5° W.L. reach the eastern United States. Signals from these orbital positions are called "half-CONUS" signals. At present an 18–inch DBS satellite dish is not capable of receiving transmissions from more than one orbital location.

There are now only a few DBS systems in operation. DIRECTV and USSB both offer full-CONUS service from their respective channels located on the satellite at 101° W.L. Because these two companies offer non-overlapping programming, they are complementary and not competitive services, and many customers subscribe to both of them. EchoStar and Directsat, subsidiaries of the same parent company, have combined their channels on the full-CONUS satellite at 119° W.L. and together transmit approximately 126 channels of video programming. DBSC is constructing a 32–transponder satellite from which it expects to begin full-CONUS service later this year. In addition, there are two companies that offer "DBS-like" programming. PrimeStar Partners, L.P., a joint venture of six cable companies and GE American Communications, broadcasts from satellites

in the Fixed Satellite Service, which requires that a subscriber use a 36–inch or 40–inch satellite dish. Although PrimeStar offers programming that is similar to that of the DIRECTV/USSB combine, it has less than half the channel capacity. AlphaStar, a Canadian firm, is reportedly scheduled to transmit, using FSS frequencies, roughly 90 channels of programming to U.S. subscribers with a 24–inch satellite dish.

Applications for DBS channels are considered mutually exclusive when the requests for channels exceeds the available supply. Although an applicant may request a specific channel assignment, "[t]he Commission ... generally consider[s] all frequencies and orbital positions to be of equal value, and conflicting requests for frequencies and orbital positions will not necessarily give rise to comparative hearing rights as long as unassigned frequencies and orbital slots remain." 47 C.F.R. § 100.13(b). Until recently, the only ways in which the FCC could assign DBS channels among mutually exclusive applicants was through a comparative hearing or a lottery. Now the Commission may, under certain circumstances, choose to auction DBS channels. *See* 47 U.S.C. § 309(j). No matter which method the FCC uses to assign channels, however, a successful applicant is granted its permit subject to due diligence requirements: the permittee must (1) "complete contracting for construction of the satellite station(s) within one year of the grant of the construction permit," and (2) begin operating its system "within six years of the construction permit grant." 47 C.F.R. § 100.19(a). In addition, any party that receives a new or additional DBS permit after January 19, 1996 must (3) complete construction of its satellite within four years of receiving its construction permit. § 100.19(b). Once it is determined that a permittee has satisfied the first due diligence requirement, the FCC assigns specific orbital positions upon a first-come, first-served basis. *See In the Matter of Advanced Communications Corp.*, 11 F.C.C.R. 3399 ¶ 6 (1995), *aff'd*, 84 F.3d 1452 (D.C.Cir.1996) (per curiam). If a permittee does not timely reach the construction and operation milestones, its permit is subject to cancellation.

The FCC granted the first permits for the construction of DBS satellites in 1982; prior to the auction at issue here, the FCC had conducted five processing rounds for DBS applicants. *Id.* at ¶ 7. In 1988 the fifth processing round began when EchoStar applied for 16 orbital channels. Four other companies—TEMPO Satellite, Directsat, DBSC, and Dominion—thereafter filed competing applications, and three more companies—USSB, Hughes Communications Galaxy (parent of DIRECTV), and Advanced Communications Corporation—filed mutually exclusive applications to modify their existing permits.

In 1989 the FCC determined that each of the applicants except TEMPO was qualified to hold a DBS permit. *Continental Satellite Corp.*, 4 F.C.C.R. 6292 ¶ 54 (1989). The Commission withheld consideration of TEMPO's application pending further review of its qualifications. *Id.* at ¶ 53. This processing round was the first time that the number of channels for which there were requests exceeded the number available. *See Advanced*, 11 F.C.C.R. 3399 ¶ 7. What to do? A comparative hearing "would likely result in considerable delay and the expenditure of substantial Commission and applicant resources." *Continental*, 4 F.C.C.R. at ¶ 55. Instead, therefore, the Commission decided to grant each application "to the extent that it is possible to award an equal number of general orbital/channel reservations to each applicant." *Id.* at ¶ 54. The agency held in reserve a sufficient number of channels in order to satisfy TEMPO's request prorata, pending the outcome of further inquiry into its qualifications. *Id.* at ¶ 53. In addition, the agency declared that the permittees would "receiv[e] a reservation," *id.* at ¶ 4, for a share of any channels that were surrendered or canceled in the future:

> [I]n the event the permit of any of these applicants, or any of the current permittees, is surrendered or canceled, the remaining permittees from this group will have the first right to additional allocations, apportioned equally, up to the number requested in their applications. Specific allocations will be awarded, as always,

on a first-come, first-served basis, as each applicant demonstrates due diligence. *Id.* at ¶ 54; *see also* ¶ 64.

EchoStar, Directsat, DBSC, Hughes, Continental, and Advanced each received a permit to provide service to the continental United States on 11 paired half-CONUS channels or on 11 full-CONUS channels—five channels fewer than any of them had requested—and USSB received the eight paired channels for which it had applied. *Id.* at ¶¶ 64–70. Three years later the FCC

| | | | | |
|---|---|---|---|---|
| 101° W.L.: | DIRECTV 27 | USSB 5 | | |
| 110° W.L.: | ACC 27 | USSB 3 | Directsat 1 | Unassigned 1 |
| 119° W.L.: | Directsat 10 | TEMPO 11 | EchoStar 11 | |

determined that TEMPO was also qualified and issued it a permit for 11 channels. *See TEMPO Satellite, Inc.,* 7 F.C.C.R. 2728 (1992).

All of the *Continental* permittees eventually satisfied the first due diligence requirement and were assigned specific orbital positions on a first-come, first-served basis. As a result of these assignments (and of assignments made in prior rounds of distribution) the full-CONUS channels were held as follows:

---

In 1995 the FCC canceled ACC's permit for 27 channels at the 110° W.L. full-CONUS orbital location and 24 channels at the 148° W.L. half-CONUS orbital location because ACC had not constructed and begun operating its satellite within six years of receiving its permit, as required by the second due diligence requirement. *Advanced,* 11 F.C.C.R. 3399. In the order announcing its decision to reclaim ACC's channels, the FCC stated that it would soon

> initiate a rulemaking to establish a new methodology for reassigning DBS channels and orbital positions that become available as a result of either cancellation by the Commission or surrender by permittees. Our thinking at this point is that opening a window for new applications for DBS authorizations for these channels (and orbital positions), and then deciding among mutually exclusive applications by auction, will best serve the public interest.

*Id.* at ¶ 3. Less than two weeks later the Commission formally proposed to assign the channels reclaimed from ACC through an auction pursuant to 47 U.S.C. § 309(j). *NPRM* at ¶ 3.

In the *NPRM* the Commission explained its concern that the pro rata distribution scheme announced in *Continental* was outmoded. At the time of its decision in *Continental,* "DBS systems were conceived as systems employing fewer than ten channels, and were authorized as such." *NPRM* at ¶ 13. The Commission was not then authorized to use an auction to distribute channels and "had only a limited range of options and no operational history upon which to base public interest determinations as to the future of DBS service." *Id.* at ¶ 9. In light of technological improvements in cable service and of experience with an operating DBS system, however, the Commission had come to believe that such small scale operations were no longer viable. *Id.* at ¶ 13. The *Continental* policy "would result in too few channels divided among six permittees to provide sufficient capacity to operate a viable system by any single permittee at either location and thus would not facilitate service to the public as we had hoped." *Id.* at ¶ 12. There would be significant delays, the Commission predicted, as the permittees negotiated over the aggregation of channels into blocks large enough to be competitive. *Id.* at ¶ 15.

The Commission's tentative view was that an auction would best serve the public interest. The Commission indicated that if it did conduct an auction, then it might implement certain rules including, in order to promote competition, a limit upon the number of full-CONUS channels that a single entity could control. *NPRM* at ¶¶ 33–43. The FCC suggested that "any DBS licensee or operator affiliated with another [multiple video programming distributor or MVPD] be permitted to control or use DBS channel assignments at only one of the orbital locations capable of full-CONUS transmission." *Id.* at ¶ 40. The Commission also requested comments on whether to subject cable operators to more stringent restrictions than other

MVPDs. *Id.* In addition, the Commission proposed to bar any permittee from aggregating more than 32 full-CONUS channels. *Id.* at ¶ 42.

In commenting upon the *NPRM* five of the six firms covered by the *Continental* order—EchoStar/Directsat, TEMPO, Continental, and DBSC—opposed abandonment of the pro rata assignment scheme adopted in *Continental.* TEMPO protested that the *Continental* policy would have worked had the Commission not "frustrated the parties' efforts to explore and consummate beneficial arrangements through its failure to approve transactions that would expedite service and its protracted delays in processing routine applications and due diligence showings." *Comments of TEMPO DBS, Inc.* 5 (Nov. 20, 1995).

EchoStar, Directsat, DBSC, and Continental suggested that by reshuffling channel assignments the Commission could create viable blocks of channels while adhering to the distribution methodology contemplated in the *Continental* order. In their joint comments on the *NPRM* EchoStar and Directsat specifically proposed that the Commission permit the *Continental* permittees to aggregate the available channels with their existing channel assignments to produce the following result:

| | | | | |
|---|---|---|---|---|
| 61.5° W.L.: | DBSC 16 | Continental 16 | | |
| 101° W.L.: | DIRECTV 27 | USSB 5 | | |
| 110° W.L.: | DIRECTV 5 | USSB 3 | TEMPO 16 | Dominion 8 |
| 119° W.L.: | Directsat 16 | EchoStar 16 | | |

EchoStar/Directsat argued that with this distribution all the full-CONUS channels would be in use by 1997. In contrast, they contended, an auction would delay service from the 110° W.L. orbital location and would not solve the problem of orphaned channel assignments. EchoStar/Directsat suggested that the Commission give the *Continental* permittees 90 days to submit joint or separate proposals for reassigning channels in keeping with the *Continental* pro rata methodology. DBSC proposed the same assignments with one minor difference: DIRECTV could receive five additional channels either at 110° W.L., as EchoStar/Directsat proposed, or at 61.5° W.L.

Continental's proposal was the same as those of EchoStar/Directsat and DBSC, except that it would not grant DIRECTV any of the reclaimed channels. Continental's proposal was based upon the assumption that the Commission would adopt a rule prohibiting any DBS service provider from operating full-CONUS channels from more than one orbital location. Continental therefore suggested that the Commission assign the channels at 110° W.L. as follows: Continental 21, USSB 3, and Dominion 8.

For its part, DIRECTV said that although it was "on record with the Commission as opposing the general use of competitive bidding with respect to satellite licensing," it believed that an auction "may be" the most efficient and rapid means of reassigning ACC's channels. *Comments of DIRECTV, Inc.* 2 (Nov. 20, 1995). DIRECTV was more concerned about some of the rules the FCC had proposed for implementing an auction and for providing service thereafter, particularly its proposal to prohibit a DBS service provider from aggregating more than 32 full-CONUS channels. That rule, DIRECTV claimed, would effectively prevent it from participating in the auction because it already controlled 32 channels. DIRECTV argued that such a limitation would be appropriate "only where the acquisition of such a spectrum would lead to or increase a particular MVPD's exercise of market power." *Id.* at 3. DIRECTV asserted that because it had only a 1.5% of the MVPD market, it could not exercise market power even if it obtained ACC's channels at the 110° W.L. orbital position, while cable operators, with 94% of the MVPD market, already exercise market power.

In the end, the Commission decided that it was in the public interest to abandon the pro rata distribution policy of *Continental* and that it had the authority instead to auction off the channels sought by mutually exclusive applicants. For the auction of the reclaimed

ACC channels the Commission adopted a rule requiring the successful bidder to divest within one year any full-CONUS channels it had prior to the auction. *DBS Order* ¶ 62. The Commission decided not to adopt some of the other rules it had proposed in the *NPRM,* such as one placing special limitations upon cable operators entering the DBS market. *Id.* at ¶¶ 73–76.

In February 1996 the FCC auctioned off the ACC channels. MCI, TCI, and EchoStar each bid on 28 channels in the 110° W.L. orbital location, and MCI prevailed with a bid of more than $682 million. MCI and EchoStar each bid for 24 channels located in the 148° W.L. orbital location, and EchoStar prevailed with a bid of $52.3 million.

## II. ANALYSIS

EchoStar, Directsat, and DBSC challenge the Commission's decision to distribute the reclaimed ACC channels by auction on the grounds that it is unlawfully retroactive and without statutory authority and that the abandonment of the *Continental* policy in favor of an auction was arbitrary and capricious. EchoStar and Directsat also join DIRECTV's challenge to the divestiture rule; DIRECTV alone opposes as arbitrary and capricious the Commission's decision not to adopt a rule restricting the participation of cable operators in the auction. We will first consider the Commission's decision to distribute channels by auction and then turn to the auction rules, starting with the petitioners' standing to challenge them.

### A. Is the rule retroactive?

▄ EchoStar, Directsat, and DBSC contend that the Commission's decision to assign DBS channels by auction is "primarily retroactive" and hence unlawful because it divests them each of the right to a pro-rata share of the ACC channels, a right that they had been given in the *Continental* order. They also charge the new rule with "unreasonable secondary retroactivity" because it comes after they invested millions of dollars in the construction of satellites with additional capacity in reliance upon the reassignment policy announced in *Continental.* In response the FCC argues that the auction rule is not primarily retroactive because the rule applied by its terms only prospectively, and not secondarily retroactive because the petitioners did not reasonably rely upon the *Continental* policy. Meanwhile, MCI contends that the petitioners' retroactivity argument is not properly before us because the petitioners never presented it to the Commission.

Although the petitioners raised only the issue of secondary retroactivity in their initial comments before the Commission, in its final order the Commission also considered whether the auction rule is primarily retroactive. Specifically, the Commission said that the new auction rule is not impermissibly retroactive because it

> applies to those [channels] currently available and those that may become available in the future. While this action modifies existing permits in a way that disrupts the permittees' expectations, it does not make past behavior unlawful or otherwise impose a penalty for past actions and thus does not have an impermissible retroactive effect.

*DBS Order* at ¶ 143. The petitioners' retroactivity argument is not barred by 47 U.S.C. § 405, therefore, on the ground that the Commission had no opportunity to address it. Moreover, we have often excused a party's failure to raise an issue before an agency if, as here, the agency has in fact considered the issue, *see, e.g., Engine Mfrs. Ass'n v. EPA,* 88 F.3d 1075, 1084 (D.C.Cir.1996); *Natural Resources Defense Council v. EPA,* 824 F.2d 1146, 1151 (D.C.Cir.1987) (citing cases); and so to the merits.

▄ The petitioners contend that the auction rule is retroactive because under *Continental* they had a right to receive a share of any forfeited or surrendered channels, and the Commission's decision to auction those channels impaired, indeed deprived them of, this right. Under *Landgraf v. USI Film Prods.,* 511 U.S. 244, 280, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994), there are three ways in which a rule can be retroactive: if it "impair[s] rights a party possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions al-

ready completed." As we see it, the rule is not retroactive in any of these three ways. The *Continental* order did not give the petitioners the right to any specific channel; it merely set out the Commission's plan for the distribution of reclaimed channels, should there ever be any. In this regard *Continental* was itself entirely prospective: it set forth what the FCC intended to do if a certain condition were to arise, which it later did when the Commission reclaimed ACC's channels. Although the petitioners may reasonably have expected that, under the *Continental* rule, they would receive a pro rata portion of any channels the Commission reclaimed, a new rule or law is not retroactive "merely because it . . . upsets expectations based on prior law." *Landgraf,* 511 U.S. at 269, 114 S.Ct. at 1499. As the Supreme Court has explained: "Even uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct: a new property tax or zoning regulation may upset the reasonable expectations that prompted those affected to acquire property; a new law banning gambling harms the person who had begun to construct a casino before the law's enactment or spent his life learning to count cards." *Id.* at 269–70 n. 24, 114 S.Ct. at 1499 n. 24.

■ Petitioners contend that even if the rule is not retroactive within the meaning of *Landgraf* it is nonetheless invalid on the ground that abandoning the *Continental* policy in favor of an auction was "secondarily retroactive." *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 220, 109 S.Ct. 468, 477, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring). In particular they claim to have spent millions of dollars building satellites with transponders for more channels than they had been assigned, relying upon the pro rata distribution policy of *Continental.* But we have never treated that sort of "retroactivity" as necessarily violating a separate legal standard. A rule that upsets expectations, as we held in *Bell Atlantic Telephone Cos. v. FCC,* 79 F.3d 1195, 1207 (D.C.Cir. 1996), may be sustained "if it is reasonable," i.e., if it is not "arbitrary" or "capricious." A change in policy is not arbitrary or capricious merely because it alters the current state of affairs. The Commission "is entitled to re-

consider and revise its views as to the public interest and the means needed to protect that interest," *Black Citizens for a Fair Media v. FCC,* 719 F.2d 407, 411 (D.C.Cir.1983), if it gives a reasoned explanation for the revision. Whether the Commission's rule is arbitrary and capricious is the issue to which we now turn.

### B. Is the rule arbitrary and capricious?

■ EchoStar, Directsat, and DBSC argue that the FCC's decision to reassign the reclaimed DBS channels by auction was arbitrary and capricious because the Commission gave short shrift to the alternative of retaining the pro rata methodology of *Continental* and because its decision to auction the channels was substantively unreasonable.

■ Under the arbitrary and capricious standard of review, of course, we do not "substitute [our] judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Rather, the Commission has wide latitude to change its policies through rulemaking "as long as it provides a reasoned explanation for doing so." *Committee for Effective Cellular Rules v. FCC,* 53 F.3d 1309, 1317 (D.C.Cir.1995). We look to see only "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2866–67.

In its final order the FCC concluded that assigning reclaimed DBS channels pro rata would not serve the public interest and that a competitive bidding process would. *DBS Order* at ¶¶ 134–36. The Commission reasoned that an auction would place the channels in the hands of the persons who value them most highly and are most likely to promote the prompt provision of DBS service. *Id.* at ¶ 136. The Commission explained that the pro rata approach adopted in *Continental* "was based upon a conception of DBS service that has not been put into practice." *Id.* at ¶ 134. Because cable operators are now promising to deliver as many as 500 channels, the Commission said, "DBS licensees

with a small number of channels face capacity limitations that may hamper their ability to compete effectively in that market." *Id.* Under the pro rata approach, the ACC channels would be divided among six permittees that, the Commission was concerned, would not be able to use them effectively or efficiently:

> In order to aggregate sufficient channels to support a viable DBS service, these permittees would have to negotiate some form of agreement for joint operations from 110°, or else work out a system of channel swaps to consolidate assignments. The process necessary in either case is often a time consuming one that is not always successful, which is further complicated by the time required for Commission consideration and approval of the resulting transactions.

*Id.* at ¶ 135.

In view of the agency's discussion of the relative merits of the alternatives before it, we cannot say that the Commission's decision to abandon the *Continental* policy in favor of an auction was arbitrary and capricious. First, contrary to the petitioners' claim, the Commission did seriously consider the various proposals for channel reassignments that some of the *Continental* permittees presented to it. The Commission reasonably concluded that the process required to get all of the *Continental* permittees, with their divergent interests, to agree to any rearrangement of the DBS channel spectrum would be "a time-consuming one," *id.* at ¶ 135, that would be "further complicated by the time required for Commission consideration and approval of the resulting transactions," *id.* at ¶ 147. At no point during the rulemaking (or indeed to date) have the petitioners presented a consensus proposal for the reassignment of ACC's reclaimed channels. Although EchoStar, Directsat, DBSC, and Continental presented similar proposals for the reassignment of the ACC channels among the *Continental* permittees, DIRECTV and TEMPO did not support their proposals. Nor is that surprising: the other permittees' proposed reassignments would improve EchoStar's competitive position by giving it an entire 32–channel full-CONUS orbital position, re-

quire TEMPO to move from the 119° to 110° W.L. orbital position so that EchoStar could take over its former slots, and give DIRECTV a possibly nonviable allocation of five channels at either 110° or 61.5° W.L.

Second, the Commission reasonably concluded that it would be in the public interest to award ACC's channels to the highest bidder in a block large enough to provide competitive DBS service. The Commission noted that auctioning the channels in blocks "obviate[s] the need for reaggregation and allow[s] the auction winners to proceed directly to acquisition or construction of satellites and operation of their systems without having to negotiate with other permittees or engage in several rounds of administrative processing." *DBS Order* at ¶ 136. In addition, the Commission explained, the auction rule would promote the rapid development of DBS service:

> Paying for spectrum provides incentives for permittees to construct quickly in order to obtain a return on their investment. Indeed, an auction is likely to promote the rapid development of service because those parties that are in the best position to deploy technologies and services are also likely to be the highest bidders.

*Id.* at ¶ 160; *see also NPRM* at ¶ 16 ("[A]uction procedures are designed to assign scarce resources to those who value them most highly and can make the most efficient use of them.").

In sum, the Commission did not lightly reject the *Continental* order, nor did it fail to give a reasoned explanation of why it believed an auction would best serve the public interest in the efficient and prompt usage of the limited DBS spectrum. Therefore, we reject the petitioners' claim that the Commission acted arbitrarily and capriciously in abandoning the *Continental* pro rata methodology in favor of competitive bidding.

**C. Is there statutory authority for the rule?**

The FCC may conduct an auction only "[i]f mutually exclusive applications are accepted for filing for any initial license or construction permit which will involve a use of the electromagnetic spectrum," 47 U.S.C. § 309(j)(1), and if the FCC finds that an

auction would promote the following statutory objectives:

(A) the development and rapid deployment of new technologies, products, and services for the benefit of the public, including those residing in rural areas, without administrative or judicial delays;

(B) promoting economic opportunity and competition and ensuring that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by minority groups and women;

(C) recovery for the use of the public of a portion of the value of the public spectrum resource made available for commercial use and avoidance of unjust enrichment through the methods employed to award uses of that resource; and

(D) efficient and intensive use of the electromagnetic spectrum.

47 U.S.C. § 309(j)(3). Subparagraph 309(j)(6)(E) also provides, however, that "[n]othing in this subsection [309(j)], or in the use of competitive bidding, shall ... be construed to relieve the Commission of the obligation in the public interest to continue to use engineering solutions, negotiation, threshold qualifications, service regulations and other means in order to avoid mutual exclusivity in application and licensing proceedings."

■ For openers the petitioners argue that the Commission lacked authority to adopt an auction rule under § 309(j) because it did not first make sufficient efforts, while still using the *Continental* approach to the assignment of licenses, to avoid mutual exclusivity among their applications. The problem with the petitioners' argument is that the Commission abrogated the *Continental* methodology before it adopted the auction rule in its stead. Once the Commission had abandoned the *Continental* methodology—for sufficient reasons, as we have seen—it was faced with mutually exclusive applications. Nothing in § 309(j)(6)(E) requires the FCC to adhere to a policy it deems outmoded

"in order to avoid mutual exclusivity in ... licensing proceedings"; rather, that provision instructs the agency, in order to avoid mutual exclusivity, to take certain steps, such as the use of an engineering solution, within the framework of existing policies.

■ The petitioners also claim that the Commission lacked authority to adopt the auction rule because it was not assigning "initial" permits, within the meaning of § 309(j)(i), for the former ACC channels. This argument would have merit if, but only if, the Commission had improperly abandoned the *Continental* policy. Under that policy the *Continental* permittees would have had the right to receive a pro rata portion of the ACC channels, and the Commission would have had to issue them modified permits reflecting the additional channels. As we have seen, however, the Commission did not improperly abandon the *Continental* policy; it was reasonable in concluding, therefore, that any permits issued for the reclaimed ACC channels would be "initial" permits under 47 U.S.C. § 309(j)(1). *See Chevron USA, Inc. v. Natural Resources Defense Council Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

■ We also reject the petitioners' argument that the Commission violated its own cut-off rules for the processing of license applications by reopening the *Continental* processing round without first disposing of the requests of applicants who had filed before the cut-off date. The *Continental* processing round concluded long ago, when the Commission assigned all the DBS channels then available and announced the policy of pro rata reassignment for any DBS channels that might be reclaimed in the future. When it later decided to abandon the pro rata policy, the Commission did not reopen a previously closed processing round; the agency merely reconsidered its method of distributing DBS channels in the light of later developments.

■ Finally, the petitioners contend that the auction rule does not foster "the development and rapid deployment of new technologies, products, and services" and the

"efficient and intensive use of the electromagnetic spectrum," as required by the Communications Act, 47 U.S.C. § 309(j)(3). As we stated earlier, however—in the course of determining that the Commission was not arbitrary and capricious in adopting the auction rule (*see* Part II.B, above)—the Commission reasonably concluded that a competitive bidding process would in fact promote these objectives.

### D. Are the structural rules arbitrary and capricious?

Finally we turn to the petitioners' challenges to the structural rules for the auction of the reclaimed ACC channels. EchoStar/Directsat and DIRECTV contend that the Commission acted arbitrarily and capriciously in adopting the divestiture rule, while DIRECTV additionally challenges the FCC's decision not to restrict the participation of cable companies or their affiliates in the auction. The FCC responds first that the petitioners lack constitutional standing to bring these challenges to the structural rules, and second that the court should reject them on their merits.

### 1. The petitioners' standing

In order to have Article III standing a party must demonstrate three things: injury in fact, a causal relationship between that injury and the conduct under challenge, and a likelihood that a favorable decision will redress the injury. *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,* — U.S. —, —, 116 S.Ct. 1529, 1533, 134 L.Ed.2d 758 (1996). The Commission contends that the petitioners are unable to satisfy any of these three requirements.

First, the Commission argues, the petitioners cannot show any injury because none of them is required by the rule to divest any channels: DIRECTV and Directsat because they did not participate in the auction, and EchoStar because it was outbid. Second, the FCC claims EchoStar's participation in the auction undermines DIRECTV's argument that it would have participated but for the deterrent effect of the divestiture rule; DIRECTV could have entered the auction and,

if the high bidder, then challenged the divestiture rule. Finally, the FCC argues that rerunning the auction sans the divestiture rule—which is the relief the petitioners seek—would not avail them unless they can show that they would then submit the highest bid.

EchoStar/Directsat did not respond to the Commission's argument against their standing, which we therefore take as conceded. Accordingly, we consider only the standing of DIRECTV to challenge the divestiture rule and the Commission's decision not to restrict the participation of the cable industry.

What is the nature of DIRECTV's injury? As we have explained before, the standing of an unsuccessful bidder for a government contract—which is in a position analogous to an unsuccessful bidder at a government auction—may be established by reference either to its lost profits or to its right to a legally valid procurement process. *See Scheduled Airlines Traffic Offices, Inc. v. Department of Defense,* 87 F.3d 1356, 1358 (D.C.Cir.1996); *CC Distributors, Inc. v. United States,* 883 F.2d 146, 151 (D.C.Cir. 1989). Here, DIRECTV's claim that the divestiture rule was an unlawful barrier to its participation in the auction entails the latter type of harm, and it "is obviously an injury both traceable to the alleged illegality in [the auction] and redressable by any remedy that eliminates the alleged illegality." *National Maritime Union of America, AFL–CIO v. Commander, Military Sealift Command,* 824 F.2d 1228, 1237–38 (D.C.Cir.1987); *see also Scheduled Airlines,* 87 F.3d at 1359.

When the alleged injury is to the complainant's right to a fair procurement process, it need not, in order to show that it has been injured in fact, demonstrate that it would be successful if the contract were let anew. As the Supreme Court explained in *Northeastern Florida Chapter of the Associated Gen. Contractors of America v. City of Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993):

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of

the former group seeking to challenge the barrier need not allege that he would have obtained the benefit in order to establish standing. The "injury in fact" . . . is the denial of equal treatment from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Accord Adarand Constructors, Inc. v. Pena,* ⸺ U.S. ⸺, ⸺, 115 S.Ct. 2097, 2105, 132 L.Ed.2d 158 (1995); *Regents of Univ. of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). In the present context, if DIRECTV was injured by the denial of an opportunity to compete upon valid terms, then it need show only that it was "able and ready to bid [on the channels] and that the [rule] prevent[ed] it from doing so on an equal basis." *Associated Gen. Contractors,* 508 U.S. at 666, 113 S.Ct. at 2303.

According to the Commission, nothing in the rule prevented DIRECTV from participating in the auction. But the FCC reads the rule as though it operated in a vacuum, without touching or being touched by the world around it. If DIRECTV had bid and prevailed at the auction, it would have been required to divest itself of the substantial block of full-CONUS channels it holds at the 101° W.L. orbital location—unless it could get the rule declared unlawful. Failing that, moreover, it would surely have realized less on the sale than it had just paid for comparable channels; by hypothesis no one else was willing to pay as much at the auction. The rule therefore placed DIRECTV at a substantial competitive disadvantage vis-a-vis other bidders, which did not have to take the risk that their successful bid would be but a costly misstep.

The Supreme Court confronted a similar situation in *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). Officeholders challenged a provision of the state constitution that required an incumbent to resign his present office in order to become a candidate for another office. The Court held that although none of them had actually announced his candidacy, the officeholders' injury was not hypothetical because they "ha[d] alleged in a precise manner that, but for the sanctions of the constitutional provision they seek to challenge, they would engage in the very acts that would trigger the enforcement of the provision." *Id.* at 962, 102 S.Ct. at 2843. Just as the automatic resignation rule in *Clements* served as a very real "obstacle to [the officeholders'] candidacy for higher judicial office," *id.,* the divestiture rule here challenged, as a practical matter, precluded DIRECTV from participating in the auction.

■ Finally, we reject the Commission's argument that the redressability of DIRECTV's injury is speculative. As we have said, DIRECTV need not prove that it would win a new auction conducted without the divestiture rule. An opportunity to bid for the full-CONUS channels reclaimed from ACC in a legally valid bidding contest would "afford [DIRECTV] just that opportunity the loss of which constitutes [its] injury." *CC Distributors,* 883 F.2d at 151; *see also Scheduled Airlines,* 87 F.3d at 1359 (provision of a legally valid procurement process would redress alleged injury).

■ On the other hand, DIRECTV does not have standing to challenge the Commission's decision not to restrict the participation of the cable industry in the auction of the DBS channels reclaimed from ACC. Only one cable company (TCI) bid, and it was not the highest bidder. Therefore, DIRECTV has not shown that the Commission's decision caused it any injury, and it is merely speculation that, if the auction were rerun (because DIRECTV prevailed on its objection to the divestiture rule), the petitioner would be outbid by a cable operator.

## 2. The merits of the petitioners' claims

■ On the merits DIRECTV contends that the FCC's decision to adopt the divestiture rule was unlawful because the rule does not further the Commission's stated objectives and is based upon a faulty economic analysis. The Commission stated that it wants to promote competition in the DBS market, but according to DIRECTV it adopted a rule that effectively excluded from the auction noncable companies, which have virtually no market power, while inviting bids from cable companies, which dominate the MVPD market.

The Commission contends that DIRECTV's focus upon market power is misguided. As the Commission explained in the *DBS Order*, its "concern is not that a DBS firm might obtain market power; rather, [its] goal is to foster rivalry among MVPDs by promoting rivalry within the DBS service." *DBS Order* at ¶ 64. In its final order the Commission explained that although DBS and other MVPDs may in the future compete directly, they do not do so now. DBS services are promoted "as higher-quality, higher-priced options targeted at those consumers that live outside cable markets or have strong preferences for niche programming, a large number of channels, and/or digital quality video signals." *Id.* at ¶ 48. Because DBS and cable are not yet in direct competition, the Commission thought it important for now to promote competition within the DBS service. *Id.* at ¶¶ 48–49. The Commission concluded that it could best do this by "encouraging the emergence of an additional [i.e. third] full-CONUS DBS competitor unrelated to existing DBS full-CONUS providers." *Id.* at ¶ 61.

Thus do we see that the Commission did not adopt the divestiture rule arbitrarily and capriciously. Rather the Commission recognized that DBS operators might compete head-to-head with cable systems and other MVPDs but thought it more important, for the nonce, to get for consumers the benefit of additional competition among DBS providers. The divestiture rule was reasonably aimed at promoting that competition by fostering the development of a third independent and competitive provider of DBS service and preventing the concentration of all the full-CONUS channels in only two firms.

## III. CONCLUSION

In summary, we hold that the Commission's decision to assign DBS channels by auction is not retroactive, arbitrary and capricious, or without statutory authority; the Commission's one-time divestiture requirement was reasonable; and DIRECTV lacks standing to challenge the Commission's decision not to exclude cable operators from the auction of the channels reclaimed from ACC. Therefore the petitions to review the Commission's new rules and regulations for DBS are

*Denied.*