United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 6, 1998 Decided February 23, 1999

 No. 97-5233

 Louis Tomasello, Jr., 

 Appellant

 v.

 Robert E. Rubin, Secretary, 

 Department of the Treasury, 

 Appellee

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 93cv01326)

 John F. Karl, Jr. argued the cause for the appellant. John 
W. Davis entered an appearance for the appellant.

 Rudolph Contreras, Assistant United States Attorney, ar-
gued the cause for the appellee. Wilma A. Lewis, United 
States Attorney, and R. Craig Lawrence, Assistant United 
States Attorney, were on brief for the appellee.


 Before: Wald, Williams and Henderson, Circuit Judges.

 Opinion for the court filed by Circuit Judge Henderson.

 Karen LeCraft Henderson, Circuit Judge: Appellant 
Louis Tomasello, formerly employed by the Alcohol Tobacco 
and Firearms Bureau (ATF) of the United States Depart-
ment of the Treasury (Treasury), sued Treasury, making 
numerous claims arising from ATF's alleged violations of the 
Privacy Act, 5 U.S.C. s 552a, the Age Discrimination in 
Employment Act (ADEA), 29 U.S.C. s 633, and Title VII of 
the Civil Rights Act, 42 U.S.C. ss 2000e et seq., during his 
long-time employment as an ATF agent. Using an advisory 
jury, the district court conducted a bench trial and at its 
conclusion awarded Tomasello $2000 under the Privacy Act, 
dismissed the ADEA retaliation claims based on sovereign 
immunity, granted judgment as a matter of law to Treasury 
on the Title VII hostile work environment and constructive 
discharge claims and rejected the advisory jury's verdict in 
Tomasello's favor on the Title VII claims arising before 
November 1991. With respect to the post-November 1991 
Title VII claims, the jury heard and rejected them. Tomasel-
lo raises several challenges on appeal: (1) he is entitled under 
the Privacy Act to $1,000 for each violation; (2) damages 
under the Privacy Act are not limited to pecuniary losses; (3) 
the district court improperly dismissed his ADEA retaliation 
claims based on sovereign immunity; (4) the pre-November 
1991 discrimination claims should have been tried by the jury 
as part of a continuing violation; (5) the hostile work environ-
ment and constructive discharge claims should have been 
submitted to the jury; and (6) in rejecting the advisory jury's 
verdict on Tomasello's pre-November 1991 Title VII retalia-
tion claims, the district court erred in finding no retaliation 
based on Tomasello's failure to establish a causal connection 
between his discrimination complaints and his non-
promotions. Although we do not reach the issues of the 
availability of non-pecuniary damages under the Privacy Act 
and whether the government has waived its sovereign immu-
nity from an ADEA retaliation claim, we affirm the district 
court in all other respects.


 I.

 Tomasello, a Sicilian-American, joined ATF in March 1971. 
In 1980 ATF posted Tomasello to Boston as a senior opera-
tions officer. In 1983 ATF named Terence McArdle, an 
Irish-American, its special agent in charge (SAC) in Boston. 
There followed a series of events that Tomasello claims 
demonstrated discrimination by Irish-American ATF person-
nel against Italian-American ATF personnel.

 In 1984 Tomasello was investigated for allegedly associat-
ing with members of the Mafia. That year, Tomasello al-
leged, McArdle remarked to him "Why can't I say 'guinea' in 
front of an Italian?," JA 306--a remark McArdle denied 
making.

 In 1985 McArdle appointed Tomasello as supervisor of 
Group B, a group of criminal investigators, after becoming 
disappointed with the performance of William Pickett, an 
Irish-American, as Group B supervisor. Tomasello claimed 
that Group B's morale and performance improved under his 
leadership but that McArdle subsequently undercut his per-
formance by replacing experienced agents with inexperienced 
ones.

 In May 1987 McArdle selected John Dowd, an Irish-
American, over Tomasello as a supervisory criminal investiga-
tor although, Tomasello claimed, he was better qualified than 
Dowd and McArdle had once referred to Dowd as "the worst 
supervisor in New England." JA 709.

 In 1988, according to Tomasello, he approached McArdle 
and complained about what he thought were McArdle's inap-
propriate and discriminatory remarks. A few months later 
Tomasello's annual performance evaluation, completed by as-
sistant SAC (ASAC) Darrell Dyer, included an overall rating 
of "Fully Successful"--two levels below the "Outstanding" 
rating Tomasello had received the year before but neverthe-
less consistent with the majority of his annual evaluations.

 In October 1988 McArdle reprimanded Tomasello and oth-
er agents for playing golf instead of attending a mandatory 
meeting during a two-day ATF seminar. The incident was 

included in Tomasello's subsequent performance appraisal 
because Tomasello was the only supervisor to have missed the 
mandatory meeting.

 In February 1989 Tomasello met with McArdle to discuss 
Tomasello's complaints of discrimination. Shortly thereafter, 
ASAC Dyer sent Tomasello a letter requesting additional 
information about an emergency expense fund expenditure 
Tomasello had approved. ATF headquarters had requested 
the information from Dyer. Tomasello admitted the expendi-
ture form was incorrect but attributed the error to misleading 
instructions. Dyer also questioned Tomasello's request for 
funds for a Lincoln Town Car.

 In May 1989 Tomasello wrote a "position paper" outlining 
what he believed to be McArdle's discriminatory treatment of 
him. He gave the paper to McArdle and eventually it went to 
ATF's chief counsel's office in Washington, D.C. Tomasello 
claims that subsequently McArdle began a campaign to re-
cruit Italian-Americans in an effort to blunt his complaints of 
discrimination. According to Tomasello, in November of that 
year McArdle recruited Peter Gagliardi, an Italian-American, 
to take over Project Achilles (a group Tomasello had helped 
establish to work with local law enforcement in apprehending 
armed career criminals). In November, McArdle appointed 
Gagliardi to that position. When Gagliardi was promoted and 
relocated to Washington, D.C. six months later,1 Frank Hart, 
who had run a similar program in Chicago and had already 
been slated to fill a different position in Boston, transferred 
laterally into the vacant position. Tomasello had by then 
been transferred to the Concord, New Hampshire office 
(allegedly to prevent him from receiving extra locality pay 
available to Boston agents).2 Because, according to Tomasel-
lo, announcement of the opening was withheld from the 
Concord office, he was barely able to meet the application 
deadline. When Hart was selected for the position, Tomasel-

__________
 1 By the time of trial, Gagliardi was fourth in command at ATF.

 2 Tomasello claimed that he had objected to being moved to 
Concord although he had more than once expressed a desire to 
transfer there.

lo applied for the position Hart had been intended to fill but 
instead Michael Catlett, an Italian-American, was chosen.

 On November 26, 1990 Tomasello filed the first of eight 
complaints with ATF's equal employment opportunity officer. 
Tomasello contends that this action triggered a series of 
retaliatory acts beginning with McArdle's taunt "[W]hatever 
you give me, I'll give you back double."

 In early 1991 while Tomasello was conducting training in 
Glynco, Georgia, he asked ASAC Dyer about reimbursement 
for additional return trips to Boston. Before faxing his 
response, Dyer telephoned the Georgia training facility and 
told the individual he spoke with that he was sending a fax 
and that it contained confidential information. Although 
Tomasello presented no evidence that anyone other than the 
person to whom Dyer spoke saw the fax (which mentioned his 
EEO complaint), he alleged that once the fax arrived, the 
"atmosphere changed." JA 558-59. This incident formed 
the basis of Tomasello's first Privacy Act claim.

 On June 26, 1991 ASAC Dyer reprimanded Tomasello after 
he had requested to attend a two-day state law enforcement 
conference to improve relations between ATF and local law 
enforcement but failed to show up. The night before the 
conference Tomasello, who was the only ATF agent scheduled 
to attend, had a "flare-up" of a chronic illness. Tomasello 
missed the second day because he could not find transporta-
tion. He failed, however, to inform his superiors that he 
could not attend either day.

 In November 1992 the CBS "60 Minutes" television pro-
gram prepared a segment on alleged discrimination at ATF 
during which both ATF Director Stephen Higgins and Toma-
sello were separately interviewed. Higgins then notified CBS 
by letter that the interviewed agent, whom he did not identify 
in his letter, had filed a discrimination complaint against 
ATF. When the interview was televised, Tomasello was 
referred to by name as having filed a discrimination com-
plaint. Higgins later faxed the letter he had sent to CBS to 
4,500 ATF agents nation-wide. This incident formed the 
basis of Tomasello's second Privacy Act claim.


 On January 27, 1993 Tomasello received a memorandum 
from McArdle regarding his improper disposal of a handgun. 
Tomasello claimed that the disposal method he used was 
"clearly authorized." McArdle disagreed, claiming that 
Tomasello should have returned it to local authorities because 
ATF had not sought forfeiture of the gun.

 In October 1993 Tomasello requested reimbursement for 
travel expenses to a retirement conference held near his 
"primary residence." He claimed travel expenses from his 
"secondary residence." ASAC Thomas Lambert, Tomasello's 
supervisor in Concord, initially questioned the expenses but, 
after consultation with ATF's chief counsel's office, changed 
his position.

 On December 28, 1993 Nealy Earl, an ATF EEO counselor 
in Hartford, Connecticut sent a copy of Tomasello's pre-
complaint counseling form to ATF's EEO Complaint Center 
in Chicago and to John McGuire, ATF's EEO Regional 
Manager in New York. In early January 1994 Earl request-
ed that McGuire fax him a copy because he no longer had his 
copy of the form and the Chicago office had not received it. 
While faxing the document, McGuire noticed a "paper jam" 
message on the fax machine and, assuming the document had 
not been successfully sent, refaxed it. Earl, however, had 
received the first transmission and left his office for the day. 
In his absence, the second fax was received by his supervisor 
who placed it in a sealed envelope and gave it to Earl later. 
This incident provides the basis of Tomasello's third Privacy 
Act claim.

 According to Tomasello, eventually the conditions of his 
employment became unbearable and he was forced to resign. 
In February 1994 Tomasello notified ATF he was resigning to 
take a position with the Environmental Protection Agency in 
Boston. Tomasello then filed this action.

 The district court treated Tomasello's third amended com-
plaint, his last, as alleging numerous Title VII and ADEA 
discrimination and retaliation claims. Relevant to his appeal 
are Tomasello's ADEA and Title VII retaliation claims with 
respect to (1) the McArdle, Dyer and Lambert memoranda; 

(2) the selection of Gagliardi and then Hart as Project Ac-
hilles supervisor; and (3) the selection of Catlett for arson 
group supervisor. Tomasello also alleged that he was sub-
jected to a hostile work environment and constructively dis-
charged. Additionally, Tomasello alleged three Privacy Act 
violations3 arising from: (1) the Glynco fax; (2) the Higgins 
letter to CBS that was later sent to 4,500 ATF agents; and 
(3) the McGuire fax to Early. The district court dismissed 
the ADEA retaliation claims,4 concluding that the United 
States had not waived its sovereign immunity. See Tomasel-
lo v. Rubin, 920 F. Supp. 4, 6 (D.D.C. 1996). Relying on 
Langraf v. USI Film Prods., 511 U.S. 244 (1994), the lower 
court also rejected Tomasello's demand for a jury trial on his 
pre-November 1991 Title VII claims5 as part of a continuing 
violation, concluding that a jury trial on those claims would 
give them impermissibly retroactive treatment. It decided, 
however, to convene an advisory jury as to the claims. See 
920 F. Supp. at 7-8.

 The case proceeded to trial with an advisory jury on the 
pre-November 1991 Title VII and Privacy Act claims. After 
hearing the evidence, the district court granted judgment to 

__________
 3 Originally Tomasello also alleged a Privacy Act violation involv-
ing a "blue ribbon panel" created after the "60 Minutes" program to 
investigate ATF's record on discrimination. Tomasello alleged that 
his records were illegally released to the panel. The district court 
dismissed the claim, finding that Tomasello had failed to demon-
strate an "adverse effect." JA 127-28.

 4 The district court granted summary judgment on Tomasello's 
ADEA discrimination claims. The Gagliardi promotion claim was 
rejected because Gagliardi was " 'insignificantly younger' " than 
Tomasello. JA 189 (quoting Celotex v. Catrett, 477 U.S. 317, 325 
(1986)). The district court also rejected claims arising from the 
Catlett transfer and a later transfer between Hart and Terence 
Berry, who had replaced Catlett as arson group supervisor, because 
Tomasello presented no evidence that he had been "considered and 
rejected" for the positions. JA 200 n.1.

 5 Tomasello pursued several other Title VII claims in district 
court but abandoned them on appeal. See JA 63-64; JA 65; JA 
68-69; JA 71-72; JA 73-74; JA 123-124.

ATF on Tomasello's hostile work environment and construc-
tive discharge claims, concluding that the alleged conduct was 
not sufficiently severe or pervasive to affect Tomasello's 
conditions of employment. The jury in its advisory capacity 
found that ATF did not discriminate against Tomasello on the 
basis of national origin but that it did retaliate in violation of 
Title VII by promoting Gagliardi and Hart over him and 
recommended a $5,000 damages award. Also in its advisory 
capacity, the jury found three Privacy Act violations based on 
the Glynco fax, the Higgins letter and the McGuire fax. The 
jury recommended a $5000 damages award for these viola-
tions as well. On the post-November 1991 Title VII claims 
(which were tried to the jury), it found that ATF neither 
discriminated nor retaliated in sending any of the documents.

 The district court rejected the advisory verdicts in favor of 
Tomasello on the Title VII retaliation claims and all of the 
Privacy Act claims save the one arising from the Higgins 
letter. Accordingly, it reduced the Privacy Act award from 
$5,000 to $2,000 and eliminated the Title VII award. See JA 
1624. The district court also denied Tomasello's motion to 
reconsider its judgment as a matter of law on the hostile 
work environment and constructive discharge claims. See JA 
1615. Tomasello then appealed (1) the district court's order 
denying a jury trial on the pre-November 1991 Title VII 
claims and dismissing the ADEA retaliation claims as well as 
its subsequent denial of Tomasello's motion to reconsider; (2) 
the district court's judgment as a matter of law on the hostile 
work environment/constructive discharge claims and its sub-
sequent denial of Tomasello's motion to reconsider; (3) the 
district court's rejection of the advisory jury verdicts on 
Tomasello's pre-November 1991 retaliation claims; and (4) 
the district court's reduction of the advisory $5,000 Privacy 
Act damages award and its refusal to award $1,000 per copy 
of the Higgins letter sent to the 4,500 ATF agents.

 II.

 Tomasello raises a number of issues on appeal. With 
respect to his Privacy Act claim arising out of Higgins's letter 


to CBS, he contends that damages under the Privacy Act are 
not limited to pecuniary loss and that he is entitled to the 
statutory $1,000 penalty for each of the approximately 4,500 
copies of the Higgins letter faxed to ATF agents nation-wide. 
Regarding his ADEA retaliation claims, he claims their dis-
missal on sovereign immunity grounds was improper. He 
further claims that the district court erred in not submitting 
the pre-November 21, 1991 Title VII discrimination claims to 
the jury as part of a continuing violation and in dismissing the 
hostile work environment and constructive discharge claims. 
Finally Tomasello claims that the district court erred in 
concluding that he had failed to causally connect his protected 
activity with ATF's allegedly retaliatory action. We address 
the claims seriatim.

 A. Privacy Act

 Noting that the Privacy Act provides that "no agency shall 
disclose any record which is contained in a system of records 
by any means of communication to any person," 5 U.S.C. 
s 552a (b), Tomasello argues that he is entitled to $1,000 for 
each copy of the Higgins letter sent to the ATF agents. We 
review this claim de novo, see Chandler v. Roudebush, 425 
U.S. 840, 863-64 (1974), and affirm the district court.

 The Privacy Act damages provision provides that:

 In any suit brought under the provisions of subsection 
 (g)(1)(C) or (D) of this section in which the court deter-
 mines that the agency acted in a manner which was 
 intentional or willful, the United States shall be liable to 
 the individual in an amount equal to the sum of--

 (A) actual damages sustained by the individual as a 
 result of the refusal or failure, but in no case shall a 
 person entitled to recovery receive less than the sum 
 of $1,000, and

 ...

5 U.S.C. s 552a(g)(4). This provision of the Privacy Act is a 
waiver of sovereign immunity and, as such, "must be con-
strued strictly in favor of the sovereign, and not enlarge[d] 

... beyond what the language requires." United States v. 
Nordic Village, Inc., 503 U.S. 30, 34 (1992) (citation omitted) 
(alterations in original). Here, the $1000 figure seems to 
refer to each time the agency "acted" or to each "refusal or 
failure." 5 U.S.C. s 552(a)(g)(4). While it may be linguisti-
cally possible to read the language so as to forbid the 
aggregation of several more-or-less contemporaneous trans-
missions of the same record into one "act[ ]" or "failure [to 
comply with the Privacy Act]," the result Tomasello seeks 
shows that such a reading defies common sense. If an 
agency revealed a record on C-SPAN, reaching millions of 
viewers, it would then be liable for billions in damages, 
according to Tomasello. Reasonable aggregation here is not 
merely "plausible"--all that is required under Nordic Village, 
see 503 U.S. at 37--but proper. Accordingly, we conclude 
that each letter disclosure is not independently compensable.6

 B. ADEA Retaliation

 Tomasello next challenges the district court's dismissal of 
his ADEA retaliation claims based on sovereign immunity. 
As we explain below, however, we need not decide the ques-
tion. Cf. Washington v. Washington Metro. Area Transit 
Auth., 160 F.3d 750, 753 (D.C. Cir. 1998) ("Because our 
resolution of the timeliness issue disposes of Washington's 
ADEA and Title VII claims, we need not reach the question 
whether his ADEA claim is nonetheless bared by the Elev-
enth Amendment.").

 Tomasello's Title VII and ADEA retaliation claims were 
based upon his "position paper," which he characterized as 
protected activity, and arose from the same allegedly retalia-

__________
 6 Tomasello now claims that the district court also erred in not 
awarding damages for emotional distress. We do not reach this 
claim because he failed to raise it below. "Absent 'exceptional 
circumstances,' the court of appeals is not a forum in which a 
litigant can present legal theories that it neglected to raise in a 
timely manner in proceedings below." Kattan by Thomas v. Dis-
trict of Columbia, 995 F.2d 274, 278 (D.C. Cir. 1993), cert. denied, 
511 U.S. 1018 (1994).

tory actions--e.g. non-selections, transfers, negative apprais-
als and critical memoranda. Both the district court, evaluat-
ing the pre-November, 1991 Title VII claims, and the jury, 
evaluating the post-November 1991 Title VII claims, found 
that ATF did not retaliate against Tomasello. Where Sev-
enth Amendment7 concerns are not implicated, as they are 
not regarding Tomasello's ADEA retaliation claims, and there 
are overlapping issues, as there are here with respect to the 
nexus between Tomasello's submission of his position paper 
and ATF's allegedly retaliatory actions and with respect to 
Tomasello's qualifications measured against Hart's and 
Gagliardi's, remand to the district court is unnecessary de-
spite improper dismissal of one of the claims. See Material 
Supply Int'l, Inc. v. Sunmatch Indus. Co., 146 F.3d 983, 988-
89 (D.C. Cir. 1998) (rejecting issue preclusion claim after 
district court improperly decided issue of fact that should 
have initially been decided by jury where Seventh Amend-
ment was implicated).8

__________
 7 The Seventh Amendment provides in part:

 In Suits at common law, where the value in controversy shall 
 exceed twenty dollars, the right of trial by jury shall be 
 preserved....

U.S. Const. amend. VII.

 8 The holding in Material Supply draws from the Supreme 
Court's opinion in Lytle v. Household Mfg., Inc., 494 U.S. 545 
(1990). In Lytle, the district court had dismissed the plaintiff's 
section 1981 claims after concluding that Title VII provided the 
exclusive remedy. The district court subsequently conducted a 
bench trial on the Title VII claims and ultimately entered judgment 
for the defendant. The plaintiff appealed and the Fourth Circuit, 
despite finding that the district court had erred in dismissing the 
section 1981 claims, held "the District Court's findings with respect 
to the Title VII claims collaterally estopped Lytle from litigating his 
s 1981 claims because the elements of a cause of action" under the 
two statutes were identical. 494 U.S. at 549. The Supreme Court 
reversed, concluding that the right to a trial by jury outweighed any 
judicial economy concerns. Id. at 553-54 ("Although our holding 
requires a new trial in this case, we view such litigation as essential 
to vindicating the [plaintiff's] Seventh Amendment rights.").

 In this case there is no Seventh Amendment issue because 
Tomasello, as a federal employee, is not entitled to a jury trial 
on his ADEA claims. See Cuddy v. Carmen, 694 F.2d 853, 
293 (D.C. Cir. 1982) ("[A]lthough a person who brings an 
action against a private employer under ADEA does have the 
right to a jury trial, a federal employee or job applicant does 
not have that right."); accord Lehman v. Nakshian, 453 U.S. 
156, 168-69 (1981) ("The conclusion is inescapable that Con-
gress did not depart from its normal practice of not providing 
a right to trial by jury when it waived the sovereign immunity 
of the United States."). Accordingly, the Seventh Amend-
ment presents no impediment to resolving the claim without 
remand. In addition we have previously held that the test for 
determining retaliation under the ADEA and Title VII is 
identical. See Passer v. American Chem. Soc'y, 935 F.2d 322, 
331 (D.C. Cir. 1991) (reciting Title VII retaliation test and 
stating "[t]here is no reason for us to apply a different test of 
retaliation in connection with claims under ADEA"). Never-
theless Tomasello argues that he is entitled to remand be-
cause "the evidence supporting retaliation under the ADEA 
would not be identical to the Title VII retaliation evidence." 
Reply Br. at 8. We do not agree. Here, assuming Tomasello 
is correct about the less than perfect fit between the Title VII 
and ADEA retaliation claims, he was not precluded from 
presenting evidence that would have demonstrated that retal-
iation motivated ATF's actions and, as noted above, the 
protected activity is the same with respect to the Title VII 
and ADEA claims. Accordingly, we affirm the district court's 
dismissal of Tomasello's Title VII and ADEA retaliation 
claims.9

 C. Title VII

 Finally, Tomasello claims that he was entitled to compensa-
tory damages and a jury trial on his pre-November 1991 Title 

__________
 9 We do not reach the ADEA sovereign immunity issue as we 
have disposed of the claims on other grounds. See Washington, 160 
F.3d at 753. Nor do we decide if non-pecuniary damages are 
available under the Privacy Act as Tomasello failed to raise the 
issue below. See Kattan, 995 F.2d at 278.

VII claims. We believe that the Supreme Court's holding in 
Landgraf v. USI Film Prods., 511 U.S. 244 (1994), that the 
compensatory damages and jury trial provisions of Title VII 
are not to be applied retroactively, forecloses his argument. 
Ignoring the reasoning of Landgraf, Tomasello argues that 
the principle enunciated in Bradley v. School Board, 416 U.S. 
696, 711 (1974), that "a court is to apply the law in effect at 
the time it renders its decision" controls, and, because the 
1991 amendments (authorizing compensatory damages and 
the right to a jury trial) were in effect at the time of trial, he 
is entitled to have his pre-November 1991 title VII claims 
heard by a jury and to seek compensatory damages. Brad-
ley, however, did not "cast doubt on the traditional presump-
tion against truly 'retrospective' application of a statute." 
Landgraf, 511 U.S. at 279 (emphasis added).10 Absent explic-
it congressional direction, which does not exist here, courts 
do not give effect to a newly enacted statute if the new 
statute " 'impair[s] rights a party possessed when he acted, 
increase[s] a party's liability for past conduct, or impose[s] 
new duties with respect to transactions already completed.' " 
DIRECTV v. FCC, 110 F.3d 816, 825-26 (D.C. Cir. 1997) 
(quoting Landgraf, 511 U.S. at 280) (alterations in original). 
Because application of the 1991 amendments here would "in-
crease [Treasury's] liability for past conduct," Landgraf, 511 
U.S. at 280, the district court was correct in not allowing the 
jury to try the pre-November 1991 Title VII claims.

 In so concluding, we reject Tomasello's contention that 
application of Title VII as amended would not be retroactive 
because he alleged a "continuing violation," that is, the con-
duct giving rise to his claims that began before the statute's 
effective date continued beyond that date. The continuing 
violation exception recognized in Thompson v. Sawyer, 678 
F.2d 257, 289 (D.C. Cir. 1982), where we applied the 1972 

__________
 10 As the Supreme Court noted in Landgraf, the grant of the jury 
trial right would ordinarily apply to a case pending at the time the 
statute granting the right is enacted. "However, because s 102(c) 
makes a jury trial available only 'if the complaining party seeks 
compensatory or punitive damages,' the jury must stand or fall with 
the attached damages provision." Landgraf, 511 U.S. at 281.


amendments to Title VII to a "narrow class of cases--those in 
which the conduct for which the Government is liable began 
before but continued beyond the effective date of the statute," 
Brown v. Secretary of the Army, 78 F.3d 645, 652 (D.C. Cir.), 
cert. denied, 117 S. Ct. 607 (1996), is not available because the 
1991 amendments do not evince the same intent. In Thomp-
son, we applied the amended statute not because the applica-
tion was not retroactive but because we were following ex-
press congressional intent that " 'the 1972 amendments ... 
be applied to the fullest extent possible.' " Brown, 78 F.3d at 
652 (quoting McKenzie v. Sawyer, 684 F.2d 62, 78 (D.C. Cir. 
1982)). As no similar intent undergirds the 1991 amend-
ments, see Landgraf, 511 U.S. at 263 ("[T]he 1991 Act con-
veys the impression that legislators agreed to disagree about 
whether and to what extent the Act would apply to preenact-
ment conduct."), the Thompson holding buttresses rather 
than undercuts our conclusion--without evidence of congres-
sional intent supporting retroactive application of the 1972 
amendments, we would not have retroactively applied them. 
Accordingly, because the right to a jury trial is tied to the 
compensatory damages provision and because an award of 
compensatory damages for preenactment conduct would have 
an impermissible retroactive effect, see supra note 11, we 
affirm the district court's decision not to submit the pre-
November 1991 claims to the jury.

 Finally we reject Tomasello's remaining claims that the 
district court erred in granting judgment as a matter of law 
on the hostile work environment and constructive discharge 
claims and that the district court "committed legal error on 
the causation issue" regarding Tomasello's claims of retaliato-
ry failure to promote. The district court dismissed the 
hostile work environment and constructive discharge claims, 
finding the alleged behavior insufficiently severe and perva-
sive as a matter of law, and ruled against Tomasello on the 
retaliatory failure to promote claim both due to the temporal 
remoteness of the protected activity from the allegedly retal-
iatory actions and because both Gagliardi and Hart were 
better qualified. Having thoroughly reviewed Tomasello's 


claims on these issues, we find them without merit.11 Accord-
ingly, we affirm the district court's dismissal of the hostile 
work environment and constructive discharge claims as well 
as its finding of no retaliation in relation to the failure to 
promote claims.

 For the foregoing reasons, the judgment of the district 
court is affirmed.

 So ordered.

__________
 11 On the retaliatory failure to promote claim, Tomasello chal-
lenges only the"temporal relationship" aspect of the district court's 
dismissal. He does not challenge the district court's finding that 
Gagliardi and Hart were better qualified. As the qualification 
ground standing alone provides an adequate basis for the district 
court's holding, we affirm and need not address the "temporal 
relationship" issue. On the hostile work environment and construc-
tive discharge claims, Tomasello asserted that the claims were 
based on specific comments and on the Dyer, Lambert and McArdle 
memoranda. He did not request the district court to consider the 
alleged Privacy Act violations in deciding the hostile work environ-
ment claim and, accordingly, he may not raise the issue for the first 
time on appeal. See Katten, 995 F.2d at 278. As this leaves only a 
series of nondiscriminatory memoranda and isolated comments, the 
last one of which occurred in 1990, we believe that the district court 
did not err in granting judgment as a matter of law on these claims. 
Cf. Beckwith v. Career Blazers Learning Ctr., 946 F. Supp. 1035, 
1051 (D.D.C. 1996).