Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 6, 2003      Decided December 16, 2003

No. 00–1369

BDPCS, Inc.,
Petitioner

v.

Federal Communications Commission and
United States of America,
Respondents

On Petition for Review of an Order of the
Federal Communications Commission

*Jane Michaels* argued the cause for petitioner. With her on the briefs were *Elizabeth A. Phelan*, *Michael D. Hays*, *Christina H. Burrow*, and *Stuart M. Gerson*.

*Stanley R. Scheiner*, Counsel, Federal Communications Commission (FCC), argued the cause for respondents. With him on the brief were *John A. Rogovin*, General Counsel, FCC, and *Daniel M. Armstrong*, Associate General Counsel, FCC, *Peter D. Keisler*, Assistant Attorney General, U.S.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Department of Justice, and *Thomas M. Bondy* and *H. Thomas Byron, III*, Attorneys, U.S. Department of Justice.

Before: Randolph and Roberts, *Circuit Judges*, and Williams, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* Roberts.

Roberts, *Circuit Judge*: Petitioner BDPCS, Inc. was the high bidder on several licenses in a Federal Communications Commission spectrum auction, but, at the appointed hour, was unable to make the required down payments. The Commission's Wireless Telecommunications Bureau promptly declared BDPCS to have defaulted on the licenses, set them for reauction, and, consistent with FCC auction rules, assessed a default penalty. BDPCS now appeals from a final order of the Commission dismissing in part and denying in part BDPCS's application for review of the default penalty order. We conclude that the Commission acted within the bounds of reasonableness and therefore deny the petition for review.

## I.

In 1996, the FCC auctioned the so-called "C block" of spectrum, distributing 493 geographic licenses to provide wireless personal communications services. Consistent with a congressional mandate to distribute spectrum licenses to small businesses, *see* 47 U.S.C. § 309(j)(3)(B), the Commission limited the C block auction to businesses falling beneath certain revenue and asset thresholds, *see* 47 C.F.R. § 24.709 (1996). Winning C block bidders were required only to make a down payment of five percent of their winning bid within five days of the close of the auction, and a second five-percent payment after the Commission officially awarded the license. *Id.* § 24.711(a)(2). The remaining 90 percent of the winning bids could be paid in installments over the term of the license. *Id.* §§ 1.2110(e), 24.711(b).

The C block auction rules, though, were not all carrot and no stick. In order to deter insincere bidding, the auction rules set out penalties for bidders who withdrew high bids during an auction or defaulted on winning bids after the

auction's close. A bidder who withdrew a high bid *during* an auction was subject to a "withdrawal penalty" — "a penalty equal to the difference between the amount bid and the amount of the winning bid." *Id.* § 24.704(a)(1). If the ultimate winning bid exceeded the high bid of the withdrawing bidder, no withdrawal penalty would be assessed. *Id.* A winning bidder who defaulted *after* the close of an auction was subject to a "default penalty" — equal to the withdrawal penalty "plus an additional penalty equal to three (3) percent of the subsequent winning bid." *Id.* § 24.704(a)(2). If the winning bid on reauction exceeded the defaulting bidder's, the additional penalty would be three percent of the defaulting bidder's winning bid. *Id.*

BDPCS was the high bidder for 17 C block licenses with bids totaling nearly $874 million. Pursuant to C block auction rules, BDPCS thus owed its initial five-percent down payment ($43.7 million) within five business days. *Id.* § 24.711(a)(2).[1] On the fifth day, however, BDPCS found itself without financing and unable to make the down payment. Instead of $43.7 million, BDPCS sent the Commission an "Emergency Petition For Waiver" seeking a thirty-day extension of the down payment deadline. BDPCS's petition cited "the unexpected inability to obtain a bridge loan" from US West, one of the Baby Bell companies, as the cause of its failure to pay. *In re BDPCS, Inc., Emergency Petition For Waiver of BDPCS, Inc.*, May 15, 1996, at 2. BDPCS stated that its parent company had made arrangements for US West to fund BDPCS's down payment obligations until BDPCS's anticipated public offering. *Id.* at 3. These financing arrangements suddenly collapsed, according to BDPCS, on May 2, four days before the close of the C block auction.[2] And

---

[1] C block auction rules required an upfront payment to participate in the auction, which would be credited to the initial down payments on licenses, or refunded in the event that a bidder won no licenses. *See id.* §§ 1.2106, 24.711(a)(1). BDPCS made an upfront payment of $7 million and thus the balance due on its initial down payment was actually $36.7 million.

[2] For its part, US West characterized BDPCS's description of the negotiations as "inaccurate" and denied having "any obligation to

despite what it describes as herculean efforts to find a new source of funding (making "every effort to raise the necessary funds through numerous contacts with different entities") BDPCS could not come up with the goods. *Id.* at 6. BDPCS needed more time.

The Commission's Wireless Telecommunications Bureau (WTB) was unmoved. Noting the important role that down payment obligations play in "ensur[ing] that an applicant is financially qualified to satisfy its obligations as a licensee," the WTB denied BDPCS's waiver petition. *See In re Emergency Petition for Waiver of Deadline for Submission of Down Payment for the Broadband PCS C Block Auction Filed by BDPCS, Inc., Order*, 11 F.C.C.R. 22,450, 22,452 ¶ 7 (1996). By the end of May, the WTB had denied BDPCS's request for reconsideration, *see In re Emergency Petition for Waiver of Deadline for Submission of Down Payment for the Broadband PCS C Block Auction Filed by BDPCS, Inc., Order on Reconsideration*, 11 F.C.C.R. 12,165 (1996), and the Commission had announced that BDPCS's licenses would be reauctioned, *see Public Notice, 18 Defaulted PCS Licenses to be Reauctioned*, 11 F.C.C.R. 22,204 (1996).

After the July 1996 reauction, the WTB tabulated BDPCS's default penalty in accordance with Rule 24.704(a)(2). *See In re BDPCS, Inc., Order*, 11 F.C.C.R. 14,399 (1996).[3] For each of the 17 licenses, the WTB first calculated the withdrawal penalty — the difference between the amount bid by BDPCS and the winning bid on reauction — and then added three percent of the lower of BDPCS's winning bid or the winning

fund any of BDPCS's down payment obligations to the FCC." Letter to Reed Hundt, FCC Chairman, from Solomon D. Trujillo, US West President & CEO, at 1–2 (quoted in *In re Emergency Petition for Waiver of Deadline for Submission of Down Payment for the Broadband PCS C Block Auction Filed by BDPCS, Inc., Order*, 11 F.C.C.R. 22,450, 22,451 n.7 (1996)).

[3] Recall that because BDPCS defaulted after the close of the auction, it owed a *default* penalty, rather than simply the *withdrawal* penalty (which would have applied had BDPCS withdrawn its high bids before the auction's close). *See* 47 C.F.R. § 24.704(a).

bid on reaction. BDPCS incurred withdrawal penalties for the eight licenses for which the winning bid at reaction was lower than BDPCS's winning bid, penalties totaling $42,765,088.50.[4] *See id.* at 14,404 Attachment A. The WTB then tacked on the three-percent default penalty for all 17 licenses — $24,930,564.73 — bringing the grand total to $67,695,653.23. *Id.* The Commission then credited BDPCS for its $7 million upfront payment, leaving a balance due of $60,695,653.23. *Id.* at 14,402 ¶ 6.

After the WTB denied reconsideration, *see In re BDPCS, Inc., Order*, 12 F.C.C.R. 6606 (1997), BDPCS applied to the Commission for review of the WTB's default payment order. BDPCS's application repeated the arguments it had made before the WTB on reconsideration: BDPCS was unable to make its down payment only because "US West abruptly refused to go forward with the bridge loan," and, in any event, "the assessment of such a large default payment on a small entrepreneurial company is inequitable and contrary to the public interest," because "the Treasury ha[d] been made whole" by the reaction of the BDPCS licenses. *In re BDPCS, Inc., Application for Review of BDPCS, Inc.*, June 19, 1997, at 5, 4, 1. BDPCS requested that the default penalty be reduced either to the $7 million upfront payment, or to the three-percent charge of $24.9 million. *Id.* at 1, 4.

The Commission did not immediately act on BDPCS's application for review. In October 1998, BDPCS filed a supplement to its application, raising several new arguments to support its position that "BDPCS has no outstanding financial obligation to the FCC" and that "BDPCS is entitled to a reimbursement of its $7 million upfront payment." Letter to Magalie Roman Salas, Secretary of FCC, from Leonard J. Kennedy, Counsel for BDPCS, at 1, 3 (First Supplement). BDPCS acknowledged that the supplement had not been

---

[4] For the nine other licenses, the winning bids at reaction exceeded BDPCS's winning bid by a total of $73,418,392.50. *See In re BDPCS, Inc, Order*, 11 F.C.C.R. at 14,404 Attachment A. Thus, in the aggregate, winning bidders at the reaction of the 17 licenses offered $30,653,304 more than BDPCS.

timely filed and requested that the Commission exercise its discretion to consider its arguments, but did not otherwise offer any excuse for the pleading's tardiness or for the fact that its arguments had not been first presented to the WTB. *Id.* at 1–2 n.2. Less than two months later, BDPCS followed with a second supplemental pleading. This pleading ostensibly requested a waiver of the default penalty — the same relief requested in BDPCS's initial Application for Review — but, this time, presented as reasons for granting the waiver yet more new arguments that the default penalty was invalid or unenforceable.

In July 2000, the Commission denied all of BDPCS's requests for relief, rejecting on the merits BDPCS's initial application for review and the waiver request presented in the Second Supplement, and dismissing all the other legal arguments raised in the First and Second Supplements as procedurally barred. *See In re BDPCS, Inc., Memorandum Opinion and Order*, 15 F.C.C.R. 17,590, 17,611 ¶¶ 38–41 (2000) (Order). The Commission agreed with the WTB that the sudden collapse of BDPCS's financing arrangements did not warrant a waiver or reduction of the default penalty. *Id.* at 17,605–07 ¶¶ 27–31. The Commission took special note of the fact that "BDPCS ha[d] admitted that four days prior to the close of the auction, it began to experience financial difficulties, and yet it remained active in the auction." *Id.* at 17,605 ¶ 28. BDPCS, the Commission concluded, "should have been cognizant of the risk that it was assuming by not withdrawing." *Id.* at 17,607 ¶ 31.

Concerning the legal arguments first raised in the First and Second Supplements, the Commission found that they were untimely and had not been first presented to the WTB, as required by Commission rules. *See id.* at 17,596 ¶ 10 (citing 47 C.F.R. § 1.115). The Commission therefore concluded that BDPCS's supplements to its Application for Review were "procedurally deficient and warrant[ed] dismissal on their face." *Id.* at 17,597 ¶ 10; *see also id.* at 17,611 ¶ 41 ("It is FURTHER ORDERED that the First Supplement . . . and the Second Supplement . . . ARE DISMISSED."). The Commission then considered and rejected BDPCS's supplemental

legal arguments on their merits, "assum[ing] that the First and Second Supplements . . . were timely filed. . . ." *Id.* at 17,597 ¶ 10; *see id.* at 17,597–604 ¶¶ 10–25, 17,608–11 ¶¶ 32–37 (consideration of BDPCS's substantive claims on their merits). This timely petition for review followed.

## II.

BDPCS has two central arguments on appeal. First, BDPCS argues that the Commission erred by not granting a waiver to reduce or eliminate the default penalty assessed by the WTB. Alternatively, BDPCS contends that although the First and Second Supplements were procedurally defective, the Commission nevertheless considered the arguments raised there on their merits, and the arguments are therefore preserved for judicial review. We are unpersuaded by these contentions and deny the petition for review.

A. *Waiver Requests.*

Our review of an agency's denial of a waiver is extremely limited; we vacate such denials only when "the agency's reasons are so insubstantial as to render that denial an abuse of discretion." *Mountain Solutions, Ltd. v. FCC*, 197 F.3d 512, 517 (D.C. Cir. 1999) (internal quotation marks omitted).

The Commission's rules *allow* the grant of a waiver only upon a showing that enforcement of the rule would not serve the rule's underlying purpose or otherwise would be inequitable, and that a waiver would be in the public interest. 47 C.F.R. §§ 24.819(a)(1)(i), (ii) (1996). Tellingly, the Commission's rules never *compel* the Commission to grant a waiver.

Here, the Commission concluded that the abrupt collapse of BDPCS's financing did not constitute adequate grounds for a waiver. *See* Order, 15 F.C.C.R. at 17,605–07 ¶¶ 28–31. The Commission noted that the purpose of the default penalty rule — "central to the integrity of the Commission's auction process" — was to encourage bidders "to make certain of their qualifications and financial capabilities before the auction so as to discourage default and avoid delays in the deployment of new services to the public." *Id.* at 17,606

¶¶ 29, 30. BDPCS frustrated this objective when it continued to participate actively in the C block auction even after it had become aware that its financing was, at the very least, seriously imperiled. *Id.* at 17,607 ¶ 31. This course of conduct, the Commission concluded, was exactly "the sort our rules are intended to deter." *Id.* The Commission thus denied the waiver request, rejecting outright BDPCS's argument that such a waiver would serve the public interest. *Id.*

The Commission did not abuse its discretion in denying the waiver request. Far from it. As the Commission pointed out, BDPCS's behavior in the auction is exactly the kind of conduct the default penalty rule was designed to deter. Enforcement of the default penalty rule was appropriate, to borrow from Voltaire, "*pour encourager les autres.*" Before the auction had closed, BDPCS knew its financing arrangements were in jeopardy. It could have withdrawn its bids then, subject only to the possibility of a withdrawal penalty. BDPCS chose another course; it not only remained in the auction, but it submitted ever-higher bids on at least one license, *see id.*, and did so resting only on the unsecured hope that the ability to pay would materialize in the end. In short, BDPCS gambled and lost. Its argument that it should not now be made to pay thus rings quite hollow.

B. *Arguments Raised in Supplemental Pleadings.*

BDPCS next contends that even if the Commission dismissed the new arguments raised in the First and Second Supplements as procedurally defective, they are nevertheless preserved for judicial review because the Commission also rejected those arguments on their merits — erroneously, says BDPCS. BDPCS is half right, but unfortunately for BDPCS it is the other half that matters here.

Section 405 of the Communications Act precludes judicial review of "questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass." 47 U.S.C. § 405(a)(2). We thus generally lack jurisdiction to review arguments that have not first been presented to the Commission. *See, e.g., Washington Ass'n for Television & Children v. FCC*, 712 F.2d 677,

680–81 (D.C. Cir. 1983). Conversely, our jurisdiction is preserved so long as the Commission has been afforded a "fair opportunity" to pass on the arguments in question. *See Omnipoint Corp. v. FCC*, 78 F.3d 620, 635 (D.C. Cir. 1996) (citing *Washington Ass'n for Television & Children*, 712 F.2d at 680–82). Here, the Commission not only enjoyed a fair opportunity to review the arguments in BDPCS's First and Second Supplements, it actually *did* review them. So BDPCS is right when it says that we have jurisdiction to review those arguments.

But that *jurisdiction* does not aid BDPCS here. While the Commission did address and reject BDPCS's arguments on their merits, it also dismissed those arguments as procedurally barred. *See* Order, 15 F.C.C.R. at 17,596–97 ¶ 10, 17,611 ¶ 41. When an agency offers multiple grounds for a decision, we will affirm the agency so long as any one of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable. *See Mail Order Ass'n of Am. v. U.S. Postal Serv.*, 2 F.3d 408, 434 (D.C. Cir. 1993); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943). So, although we have jurisdiction to review the merits of BDPCS's substantive arguments, BDPCS — to prevail — must also circumvent each of the two independent procedural grounds upon which the Commission dismissed those same arguments. This BDPCS cannot do.

We review an agency's dismissal of pleadings on procedural grounds under the familiar standards of the Administrative Procedure Act, setting aside such dismissals only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(a)(2). Citing this Court's decision in *Graceba Total Communications v. FCC*, 115 F.3d 1038 (D.C. Cir. 1997), BDPCS seems to assert that the Commission's consideration of the merits of its supplemental arguments has the effect of abrogating the dismissal, on procedural grounds, of those same arguments. This mischaracterizes our holding in *Graceba*. There, the Commission had rejected Graceba's constitutional objection to an FCC order as untimely, but went on to consider (briefly) the merits of the argument. *See id.* at 1040–41. We found that

the Commission's consideration of Graceba's argument was sufficient to satisfy the exhaustion requirements of Section 405, thus preserving our jurisdiction to review Graceba's substantive claims. *Id.* at 1041. Rather than opine on the merits, we remanded the case to the Commission for a fuller consideration of Graceba's constitutional claim. *Id.* at 1041–42. Critically, though, we remanded on the merits only after we had held that the Commission's dismissal of the argument as untimely was improper. *Id.* at 1040–41. It is only because we had found error in the Commission's procedural ground that we could grant relief on the merits.

Missing from BDPCS's citations to authority is any case in which we granted relief on the merits, notwithstanding the fact that the Commission had *properly* dismissed the pleading on procedural grounds. BDPCS points to our decision in *Office of Communication of the United Church of Christ, Inc. v. FCC*, 911 F.2d 803, 809 (D.C. Cir. 1990), but that case offers no assistance to its cause. There, the FCC had dismissed the petitioner's challenge on procedural grounds, but nevertheless considered the merits of the argument. Just as in *Graceba*, we concluded that the Commission's consideration of the merits preserved our jurisdiction under Section 405. *Id.* at 809. We moved immediately to the merits and rejected the petitioner's argument. *Id.* at 812. That consideration of the merits, however, did not *sub silentio* undermine the force of the Commission's procedural dismissal. If we had concluded that the petitioner had the better of the argument on the merits, we then would have had to confront the Commission's procedural ground, and, if the petitioner were ultimately to be granted relief, to find it invalid. Our conclusion that the petitioner's claim failed on the merits, however, rendered unnecessary further discussion of the Commission's procedural ground.

Here, we can find no error in the Commission's procedural rulings. BDPCS concedes that the arguments in the First and Second Supplements were not timely raised to the Commission and never had been presented to the WTB. On the timeliness issue, this Court has held often enough that the Commission does not abuse its discretion when it "decline[s]

to entertain a late-filed petition in the absence of extenuating circumstances prohibiting a timely filing." *21st Century Telesis Joint Venture v. FCC*, 318 F.3d 192, 200 (D.C. Cir. 2003). In fact, we have gone so far as to discourage the Commission from entertaining late-filed pleadings "in the absence of extremely unusual circumstances." *Id.* at 199–200. Here, we need not question whether the circumstances presented by BDPCS are adequately "extenuating" because BDPCS has never presented *any* excuse for its failure to raise its arguments in a timely manner. It follows that the Commission did not abuse its discretion by dismissing the untimely arguments.

If that were not sufficient, there remains the second procedural basis for the Commission's dismissal — BDPCS's failure to present the supplemental arguments to the WTB. This is an equally open-and-shut case: the Commission's rules do not permit the Commission to grant an application for review "if it relies on questions of fact or law upon which the designated authority has been afforded no opportunity to pass." 47 C.F.R. § 1.115(c). The Commission abuses its discretion when it arbitrarily violates its own rules, not when it follows them.

Because we uphold the Commission's order on these procedural grounds, we have no occasion to reach the merits of BDPCS's arguments on the invalidity of the WTB's default payment order.

The petition for review is denied.