# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 8, 2019       Decided February 21, 2020

No. 18-1241

NTCH, INC.,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

DISH NETWORK CORPORATION,
INTERVENOR

Consolidated with 18-1242

On Petition for Review and Notice of Appeal of
Orders of the Federal Communications Commission

*Donald J. Evans* argued the cause for appellant. With him on the briefs was *Keenan Adamchak*.

*Maureen K. Flood*, Counsel, Federal Communications Commission, argued the cause for appellee. With her on the brief were *Michael F. Murray*, Deputy Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Frances E. Marshall*, Attorneys, *Thomas M. Johnson Jr.*, General Counsel, Federal Communications Commission,

*David M. Gossett*, Deputy General Counsel, and *Richard K. Welch*, Deputy Associate General Counsel. *Jacob M. Lewis*, Associate General Counsel, Federal Communications Commission, entered an appearance.

*Bryan N. Tramont* and *J. Wade Lindsay* were on the brief for intervenor. *Jennifer B. Tatel* entered an appearance.

————

No. 18-1243

NTCH, INC.,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

DISH NETWORK CORPORATION,
INTERVENOR

————

On Petition for Review of Orders of the
Federal Communications Commission

————

*Donald J. Evans* argued the cause for petitioner. With him on the briefs was *Keenan Adamchak*.

*Sarah E. Citrin*, Counsel, Federal Communications Commission, argued the cause for respondents. With her on the

brief were *Michael F. Murray*, Deputy Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Frances E. Marshall*, Attorneys, *Thomas M. Johnson Jr.*, General Counsel, Federal Communications Commission, *David M. Gossett*, Deputy General Counsel, and *Richard K. Welch*, Deputy Associate General Counsel. *Jacob M. Lewis*, Associate General Counsel, and *Maureen K. Flood* and *Thaila Sundaresan*, Counsel, Federal Communications Commission, entered appearances.

*Bryan N. Tramont* and *J. Wade Lindsay* were on the brief for intervenor. *Jennifer B. Tatel* entered an appearance.

Before: TATEL, GARLAND, and GRIFFITH, *Circuit Judges*.

Opinion for the court filed PER CURIAM.

PER CURIAM: Title III of the Communications Act of 1934 charges the Federal Communications Commission with the regulation of the "channels of radio transmission." 47 U.S.C. § 301. These cases arise out of three Commission spectrum-management decisions. First, the Commission "modified" Dish Network Corporation's licenses in the "Advanced Wireless Services-4 Band" (the "AWS-4 Band") to authorize the company to develop a stand-alone terrestrial network that could support wireless broadband services. Then, a year later, the Commission "waived" certain technical restrictions on these modified licenses, though it conditioned the waivers on Dish's commitment to bid a certain sum of money in a public auction for adjacent spectrum in the so-called "H Block." And finally, the Commission designed and conducted "Auction 96," in which Dish bid as promised and won the H Block licenses.

NTCH, Inc., a competitor to Dish, challenges all three decisions. For the reasons set forth below, we deny its petitions

4

for review of the orders modifying Dish's AWS-4 licenses and establishing Auction 96's procedures. But because the Commission wrongly dismissed NTCH's challenges to the waiver orders for lack of administrative standing, we remand to the Commission to consider those claims on the merits.

## I.

### A.

The AWS-4 Band's history begins, for present purposes, with the disappointing commercial deployment of "mobile satellite service" (MSS)— "a satellite-powered technology that provides email and cellular-like phone services," particularly in hard-to-reach areas and during natural disasters. *Globalstar, Inc. v. FCC*, 564 F.3d 476, 480 (D.C. Cir. 2009). Back in 1997, bullish on MSS, the Commission allocated spectrum for MSS and soon granted licenses to eight operators.

By 2003, however, satellite's prospects seemed bleak compared to terrestrial technologies—*i.e.*, those that route radio communications through cell towers. To put MSS spectrum to better use, the Commission authorized MSS licensees to offer "ancillary" terrestrial services. *See In re Service Rules for Advanced Wireless Services in the 2000-2020 MHz and 2180-2200 MHz Bands*, 27 FCC Rcd. 3561, 3564–65, ¶¶ 5–6 (2012) ("*AWS-4 NPRM*"). The Commission thus allowed "MSS operators to augment their satellite services with terrestrial facilities" by "re-using frequencies assigned to MSS operations." *Id.* at 3564, ¶ 5. But the Commission imposed a condition on this new flexibility: before an MSS licensee could offer terrestrial services, it would first need to provide "substantial satellite service." *Id.*

This condition thwarted the development of terrestrial networks. Unable to make "substantial" satellite service commercially viable, licensees could not avail themselves of the terrestrial option. *Id.* at 3565, ¶ 8. By 2011, six of eight MSS licensees had surrendered their licenses. When the last two licensees filed for bankruptcy, Dish swooped in, acquiring the licenses from the bankrupt companies.

As the MSS spectrum fell into desuetude, the market for "wireless broadband" (which sends information to data-hungry devices like iPhones and iPads) was booming. Indeed, the Commission worried that, soon enough, "mobile data demand [would] exhaust spectrum resources." *Id.* at 3567, ¶ 10. In response, Congress enacted legislation instructing the Commission to develop a "national broadband plan" to "ensure that all people of the United States have access to broadband capability." American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 6001(k)(2)(D), 123 Stat. 115, 516. The Commission's resulting *National Broadband Plan* acknowledged that its insistence on "substantial satellite service" in the AWS-4 Band made it "difficult for MSS providers to deploy ancillary terrestrial networks." *See* FEDERAL COMMUNICATIONS COMMISSION, CONNECTING AMERICA: THE NATIONAL BROADBAND PLAN 87-88 (2010). The plan thus recommended a subtle but critical shift in the AWS-4 Band: authorize "stand-alone terrestrial services" *without* the requirement that licensees first offer satellite service. *Id.* And in 2011, the Commission took a first step towards implementing this recommendation, setting aside "co-primary" terrestrial allocations in the satellite ranges. *AWS-4 NPRM*, 27 FCC Rcd. at 3568, ¶ 14.

NTCH's first challenge—to the modification of Dish's licenses, *see infra* Part II—arises out of the Commission's efforts to further implement the *National Broadband Plan*'s

recommendation. In March 2012, the Commission sought comments on a proposal to "increase the Nation's supply of spectrum for mobile broadband" by creating service rules and assigning licenses for "terrestrial services" in the AWS-4 Band. *AWS-4 NPRM*, 27 FCC Rcd. at 3563, ¶ 1. But the Commission also sought to preserve the possibility of satellite service. Noting that its 2011 decision allocated the AWS-4 Band "on a co-primary basis," the Commission insisted that its new policies should protect satellite systems from "harmful interference caused by [terrestrial] systems." *Id.* at 3569–70, ¶ 17; 3587, ¶ 80.

Given its continued commitment to satellite, the Commission proposed to use its authority under § 316 of the Communications Act to "modify" Dish's licenses to allow it to offer terrestrial services. *Id.* at 3585–86, ¶¶ 74–78; *see* 47 U.S.C. § 316(a). The Commission reasoned that allowing "same-band, separate-operator" sharing of the spectrum—*i.e.*, dividing the terrestrial and satellite rights between two licensees—could hinder coordination between the two operators, and thus cause interference between the two services. *Id.* at 3586–87, ¶¶ 79–80. Back in 2003, when the Commission first opened the AWS-4 Band for ancillary terrestrial use, the Commission found that same-band, separate-operator sharing was unworkable, and the Commission expected that operators would face the same issues in 2012. Seeking more information, however, the Commission asked commenters whether "technological advances" since 2003 should "reinforce or alter" the Commission's expectations. *Id.* at 3584, ¶ 72. If commenters established the feasibility of separate licensees, the Commission explained, it would consider changing course to "seek comment on other approaches," including "the assignment of new initial licenses" to the terrestrial rights through "competitive bidding." *Id.* at 3587, ¶ 80.

Nobody changed the Commission's mind. And so, in December 2012, the Commission's *AWS-4 Order* adopted the *AWS-4 NPRM*'s proposed approach. *See In re Service Rules for Advanced Wireless Services in the 2000-2020 MHz and 2180– 2200 MHz Bands*, 27 FCC Rcd. 16,102, 16,110–12 (2012) ("*AWS-4 Order*"). As the Commission explained, it "received numerous comments" confirming that "technical hurdles [to operator sharing] remain" and that granting a terrestrial license to "an entity other than the MSS incumbent remains impractical." *Id.* at 16,165, ¶ 166. Although one commenter suggested that "known technologies" would allow spectrum sharing, *id.* at 16,172, ¶ 182; *see* 18-1243 J.A. 142–54 (comments of MetroPCS), the Commission disagreed, claiming that these technologies were not "market-proven" and could only work if one operator controlled both uses of the spectrum. *Id.* at 16,172, ¶ 182. The Commission also noted that "no commenter," MetroPCS included, submitted technical evidence that disputed its 2003 finding. *Id.* at ¶ 183.

The Commission announced that it would use its § 316 modification authority to "allow [Dish] to operate terrestrial services, rather than make the band available . . . under a sharing regime." *Id.* at 16,171, ¶ 181. Acknowledging that Dish's licenses would "increase in value," the Commission reasoned that modifying these licenses was the "best and fastest method for bringing this spectrum to market." *Id.* at 16,170, ¶ 178.

The *AWS-4 Order* also imposed two relevant restrictions on Dish's licenses. First, the Commission protected the remaining satellite services from interference by designating the AWS-4 Band's lower portion (*i.e.*, 2000–2020 MHz) for "uplink" operations and the upper portion (*i.e.*, 2180–2200 MHz) for "downlink" operations. *Id.* at 16,117, ¶ 39. The

"downlink" channel sends information from cell towers to mobile devices, and the "uplink" channel goes the other way. 18-1241 FCC Br. 9 n.2. Although mobile data networks use far more downlink than uplink data, the Commission concluded that this limitation was necessary to ensure functioning satellite service in the AWS-4 Band. *AWS-4 Order*, 27 FCC Rcd. at 16,117, ¶ 39. Second, to ensure the "timely deployment" of Dish's new terrestrial rights, the Commission imposed "performance requirements" on Dish's use of the AWS-4 Band. *Id.* at 16,176, ¶ 193; 16,173–74, ¶¶ 187–88. Relevant here, failure to offer reliable terrestrial services within seven years of the order would trigger the automatic termination of Dish's licenses. *Id.*

In February 2013, the Wireless Telecommunications Bureau (the "Bureau")—a sub-delegee within the Commission, *see* 47 C.F.R. § 0.131—modified Dish's licenses according to the terms of the *AWS-4 Order*. The following month, NTCH filed identical petitions for reconsideration with the Commission, challenging the *AWS-4 Order* and the modification of Dish's license. In August 2018, the Commission dismissed and alternatively denied the petitions. NTCH timely filed a petition for review, and we have jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342. We address the merits of this petition in Part II.

**B.**

In 2012, as the Commission took steps to modify Dish's AWS-4 licenses, Congress also sought to address the "growing need for spectrum" for wireless networks. *National Ass'n of Broadcasters v. FCC*, 789 F.3d 165, 168–69 (D.C. Cir. 2015). Congress thus passed the Spectrum Act, which directed the Commission to use a "system of competitive bidding" to "allocate" a spectrum band dubbed the "H Block." Middle

Class Tax Relief and Job Creation Act of 2012 (the "Spectrum Act"), Pub. L. No. 112-96, § 6401(a)-(b), 126 Stat. 156, 222-23 (codified at 47 U.S.C. § 1451(b)).

In response, the Bureau announced that it would hold Auction 96 to allocate 176 licenses in the H Block, segregated based on geographic area. *See Auction of H Block Licenses in the 1915-1920 MHz and the 1995-2000 MHz Bands*, 28 FCC Rcd. 10,013, 10,045-46 (2013) ("*Auction Proposal*"). The Bureau sought comment on whether it should "establish a reserve price" for the auction, below which the spectrum would not be sold. *Id.* at 10,026, ¶ 52. The Bureau further proposed to set that reserve price based "on the aggregate of the gross bids for the H Block licenses, rather than license-by-license." *Id.* Commenters generally agreed with the Bureau's proposal, though none suggested a specific aggregate reserve price.

On September 9, 2013, after the comment period closed, Dish filed a two-page letter suggesting an aggregate reserve price of at least "$0.50 per megahertz of bandwidth per population ('MHz-POP')." 18-1241 J.A. 50. MHz-POP is a unit equal to the number of megahertz multiplied by the population of a region; for example, if ten megahertz of spectrum reaches 750,000 people, then MHz-POP equals 7,500,000. *See* 18-1241 FCC Br. 12 n.3. Dish derived its estimate from private sales and Commission auctions of similar spectrum, and referenced reports from financial institutions valuing the H Block between $0.62 and $1 per MHz-POP.

That same day, Dish also filed a petition asking the Bureau to "waive" some of the restrictions on its AWS-4 licenses. 18-1241 J.A. 54. Specifically, Dish sought to use the lower AWS-4 Band for downlink operations (rather than just uplink operations, as the *AWS-4 Order* required). *See* 47 C.F.R. §§ 27.5(j), 27.53(h)(2)(ii). Dish also requested a one-year

extension to the seven-year deadline to offer substantial terrestrial service in the AWS-4 Band. Dish claimed that the waivers would allow it to "harmonize[]" its uses of the H Block and the AWS-4 Band, and Dish committed to bid the "aggregate nationwide reserve price . . . in the upcoming H Block auction (not to exceed $0.50 per MHz/POP)" if the Bureau granted the waivers. 18-1241 J.A. 68.

Four days later, on September 13, the Bureau took two key actions: it sought public comment on Dish's waiver petition and announced the procedures for the H Block auction. In its announcement, the Bureau credited Dish's valuation of $0.50 per MHz-POP and thus set the aggregate reserve price at $1.564 billion.

NTCH quickly registered its opposition to both proposed actions. First, on September 30, it filed a public comment objecting to Dish's waiver petition, claiming that Dish and the Commission made a "backroom deal" amounting to a "cash-for-waiver quid pro quo." 18-1241 J.A. 194–95. NTCH further objected that granting Dish's waivers would bring no "public interest benefits." *Id.* Second, on October 18, NTCH filed a petition for reconsideration of the auction procedures. *Id.* at 215. NTCH asked the Bureau to revisit Auction 96's aggregate reserve price, claiming that a "deal brokered by the Commission" generated this "astronomical" sum. *Id.* at 218–220. Meanwhile, as Dish's waiver petition and NTCH's petition for reconsideration were pending, NTCH chose not to sign up for Auction 96 by the deadline. NTCH thus never bid on the H Block licenses.

The Bureau denied NTCH's petition for reconsideration, explaining that NTCH offered no reason to lower the reserve price, and that any "arrangement" was already disclosed because Dish's waiver petition was filed in a public docket

where interested parties could submit comments. *See In re NTCH, Inc.*, 28 FCC Rcd. 16,108, 16,112–13, ¶¶ 13–17 (Wireless Bureau 2013). Moreover, to the extent NTCH took issue with Dish's commitment to pay the reserve price in the *waiver* request, the Bureau concluded that NTCH's objection was misplaced. *Id.* at 16,113–14, ¶¶ 17–19. Because Dish's petition would be "resolved in a separate proceeding," NTCH's petition for reconsideration of the auction procedures was not an "appropriate vehicle for a premature attack on . . . the waiver request." *Id.*

The Bureau then granted Dish's waiver petition on December 20. *See In re Dish Network Corp.*, 28 FCC Rcd. 16,787 (Wireless Bureau 2013). Responding to NTCH's objections, the Bureau denied any inappropriate backroom deal with Dish and stated that it had made its decision "based on the public record." *Id.* at 16,808, ¶ 53. Given Dish's "unique" status as an AWS-4 and MSS licensee, the Bureau concluded that applying the rules to Dish "would be both unduly burdensome and contrary to the public interest." *Id.* at 16,794, ¶ 18. The Bureau further concluded that it could consider Dish's "commitment to ensure that the H Block auction satisfies the aggregate reserve price" as an "additional public interest benefit." *Id.* at 16,808–09, ¶ 53. The Bureau therefore granted Dish's waiver, allowing Dish to "elect" whether to switch to downlink operations. *Id.* at 16,802–03, ¶ 38. The Bureau also granted the one-year extension for Dish's performance requirements in the AWS-4 Band. *Id.* at 16,804–05, ¶¶ 41–43.

The Bureau then conducted Auction 96 as proposed. Dish bid a total of $1.564 billion on the licenses—exactly the aggregate reserve price—and won them all.

In December 2013 and January 2014, NTCH timely filed two applications for review of the Bureau's orders—one challenging Auction 96's procedures, the other challenging the Bureau's grant of Dish's waivers for its AWS-4 licenses. The Commission sat on these applications until 2018, then rejected both. Regarding NTCH's objections to the auction procedures, the Commission dismissed NTCH's application because it failed to "specify with particularity" the Bureau's errors, as the Commission's rules required. *In re NTCH, Inc.*, 33 FCC Rcd. 8446, 8450–51, ¶ 11 (2018); *see* 47 C.F.R. § 1.115(b). Alternatively, the Commission rejected NTCH's various arguments on the merits. *Id*. at 8451–54, ¶¶ 12–18. Regarding NTCH's objections to the Bureau's grant of Dish's waivers, the Commission dismissed NTCH's application for lack of administrative standing, concluding that NTCH's failure to register for the auction—not the Commission's grant of the waivers—caused NTCH to lose its opportunity to bid on the licenses. *In re Dish Network Corp.*, 33 FCC Rcd. 8456, 8459 ¶ 9 (2018).

NTCH timely petitioned for review of the auction orders, and we have jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342. NTCH also timely appealed the Commission's denial of its application for review of the waiver order, and we have jurisdiction under 47 U.S.C. § 402(b). We address the merits of both petitions in Part III.

## II.

We begin with NTCH's petition for review of the Commission's decision to modify Dish's licenses in the AWS-4 Band. NTCH advances three reasons that we should set aside these modifications: (1) the Commission's decision was arbitrary and capricious because the Commission failed to consider reasonable alternatives and because the decision

lacked support in the record; (2) § 309(j) of the Communications Act compelled the Commission to auction off the terrestrial rights as "initial licenses"; and (3) the Commission's changes to Dish's licenses were so substantial that they exceeded its authority to modify licenses under § 316. Because we find the first and second arguments meritless and the third forfeited, we deny NTCH's petition for review.

**A.**

Before tackling NTCH's arguments, we must confirm our jurisdiction to consider them. *See American Rivers v. FERC*, 895 F.3d 32, 40 (D.C. Cir. 2018). To have Article III standing, NTCH must show that it suffered an "injury in fact," that the "conduct under challenge" caused such injury, and that a "favorable decision" will likely "redress the injury." *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 829 (D.C. Cir. 1997). NTCH argues that it has done so because the Commission's modification of Dish's licenses "deprived [it] of an opportunity [to] obtain an AWS-4 license by a fair and open process." 18-1243 NTCH Br. 15.

This suffices to show standing. An "unsuccessful bidder" in a Commission auction suffers a cognizable injury if the Commission deprives the bidder of the right to a "legally valid procurement process." *DIRECTV*, 110 F.3d at 829; *see also Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1, 6-7 (D.C. Cir. 2009). An unfair auction places a bidder at a "substantial competitive disadvantage" that constitutes Article III harm. *DIRECTV*, 110 F.3d at 830. It makes no difference whether that disadvantage flows from unfair procedures or the Commission's failure to conduct any auction at all. NTCH contends that the modification decision was flawed and that the Commission should have auctioned off the terrestrial rights instead, and we must assume—at this stage—NTCH's success on the merits.

*See City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003). Assuming as much, NTCH's loss of a chance to bid on the spectrum constitutes an Article III harm caused by the Commission's decision to modify Dish's licenses.

The Commission contends, however, that NTCH cannot satisfy Article III's "redressability" element. According to the Commission, it has no *obligation* to conduct a public auction, so a favorable decision is not likely to redress NTCH's injury. 18-1243 FCC Br. 33-35. As the Commission explains, its duty to auction off licenses only kicks in once it receives "mutually exclusive applications" for "initial licenses," 47 U.S.C. § 309(j)(1), and the Communications Act preserves the Commission's discretion to "avoid mutual exclusivity in application and licensing proceedings"—thus averting the need to auction the licenses. 47 U.S.C. § 309(j)(6); *see also M2Z Networks, Inc. v. FCC*, 558 F.3d 554, 563 (D.C. Cir. 2009). More still, the Commission points out, it could decline to allocate the terrestrial rights in the AWS-4 Band altogether.

All this is true, but the Commission may not use its discretion to defeat NTCH's standing. As the Supreme Court stated in *FEC v. Akins*, a challenger's injury is redressable even if an agency "might reach the same result exercising its discretionary powers lawfully." 524 U.S. 11, 25 (1998). Indeed, the Commission's argument proves too much, for it would allow agencies to shield their actions from judicial review by invoking their policymaking discretion. In any event, the administrative record suggests that the Commission would likely conduct an auction on remand. The *AWS-4 NPRM* stated that, if commenters changed the Commission's mind about the modification approach, the Commission would "seek comment on other approaches"—including the "assignment of new initial licenses via competitive bidding." *AWS-4 NPRM*, 27 FCC Rcd. at 3,587, ¶ 80. Therefore, NTCH has standing.

**B.**

Now to the merits. NTCH's core argument is that we should vacate the *AWS-4 Order* because the Commission failed to consider reasonable alternatives and because its decision lacked support in the record. We will set aside the Commission's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). But when the Commission acts to foster "innovative methods of exploiting the spectrum," it "functions as a policymaker" to which we afford "the greatest deference." *Mobile Relay Associates v. FCC*, 457 F.3d 1, 8 (D.C. Cir. 2006). We will accept the Commission's "technical judgment[s]" when supported "with even a modicum of reasoned analysis, absent highly persuasive evidence to the contrary." *Id.* (internal quotation marks omitted). And the Commission's "predictive judgments" "within [its] field of discretion and expertise are entitled to particularly deferential review, as long as they are reasonable." *See Earthlink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006) (internal quotation marks omitted).

This deferential standard of review makes NTCH's task a daunting one. The Commission's decision to authorize stand-alone terrestrial services in the AWS-4 Band sought to encourage "innovative methods of exploiting the spectrum," *Mobile Relay Associates.*, 457 F.3d at 8, to address the "urgent need" for wireless broadband, *AWS-4 NPRM*, 27 FCC Rcd. at 3567, ¶ 10. And the Commission chose to modify Dish's licenses largely because of the "technical judgment," *Mobile Relay Associates*, 457 F.3d at 8, that same-band, separate-operator sharing of the spectrum would be impractical. Indeed, NTCH conceded at oral argument that it does not challenge this finding. Oral Arg. Tr. (No. 18-1243) 5:4–9.

Accepting this technical judgment, however, the Commission's decision to modify Dish's licenses follows quite logically. As the Commission explained, Dish could easily minimize interference between its satellite and terrestrial uses of the spectrum, *AWS-4 Order*, 27 FCC Rcd. at 16,171, ¶ 181, and Dish already had some authority to offer ancillary terrestrial services, *id.* at 16,169–70, ¶ 177. Besides resolving this core technical issue, modifying Dish's licenses would also, the Commission anticipated, ensure quicker use of the spectrum. To encourage Dish's development of a terrestrial network, the Commission compelled Dish to develop "reliable terrestrial signal coverage"—or else forfeit its licenses in the AWS-4 Band. *Id.* at 16,173–74, ¶¶ 187–88.

NTCH responds that the Commission failed to consider alternative policies—specifically, that it should have reallocated the *entire* AWS-4 Band to terrestrial use alone. 18-1243 NTCH Br. 21-29. The technical concern about splitting up satellite and terrestrial licenses dissolves if the Commission eliminates satellite service. And because the Commission agrees with NTCH that commercial satellite service remains "virtually non-existent," 18-1243 Reply Br. 18 (quoting *AWS-4 Order*, 27 FCC Rcd. at 16,171, ¶ 177), NTCH reasons that nothing would be lost by eliminating satellite rights. Indeed, NTCH is not alone in this contention; before the Commission, commenters offered similar suggestions. AT&T claimed, for instance, that the Commission could reduce satellite service to twenty megahertz of the AWS-4 Band, then auction off the remaining twenty megahertz as pure terrestrial service. 18-1243 J.A. 116-18; *see also id.* at 148–49 (similar, comments of MetroPCS); *id.* at 190–91 (similar, comments of T-Mobile).

But this alternative was beyond the scope of the Commission's rulemaking. As the Commission points out, the *AWS-4 NPRM* never suggested that it was considering

eliminating Dish's satellite rights in the AWS-4 Band. 18-1243 FCC Br. 34. Instead, the Commission sought to enable terrestrial services in a way that "protect[ed] the incumbent [satellite] licensee from harmful interference." *AWS-4 NPRM*, 27 FCC Rcd. at 3583, ¶ 68. Accordingly, when NTCH suggested eliminating satellite service, the Commission dismissed its comment as an "untimely" petition to reconsider its earlier order "co-allocating" the AWS-4 Band for terrestrial and satellite uses. *AWS-4 Order*, 27 FCC Rcd. 16,171, ¶ 180 n.532. Likewise, when NTCH filed its petition for reconsideration, the Commission determined that NTCH's argument was "beyond the scope of the matters that [could] be addressed in this proceeding." 18-1243 J.A. 408, ¶ 20 (citing 47 C.F.R. § 1.429(*l*)(5)).

In these circumstances, we cannot say that the Commission's failure to consider stripping Dish of its satellite rights was unreasonable. Boiled down, NTCH claims that the Commission should have expanded the rulemaking's scope to consider NTCH's preferred resolution of the problem. But the Commission need not "resolve massive problems in one fell regulatory swoop;" instead, it may "whittle away at them over time." *Massachusetts v. EPA*, 549 U.S. 497, 524 (2007). Here, the Commission reasonably limited the rulemaking proceeding to proposals to expand terrestrial uses of the AWS-4 Band. *See National Mining Ass'n v. Mine Safety & Health Administration*, 116 F.3d 520, 549 (D.C. Cir. 1997) (noting that the agency's explanation that a comment was "beyond the scope of the rulemaking" was an "adequate" explanation of its decision).

NTCH also argues that the Commission wrongly assumed that modifying Dish's licenses would be the "most efficient and quickest path to enabling flexible terrestrial use" of the AWS-4 Band. 18-1243 NTCH Br. 29-32; *AWS-4 Order*, 27 FCC Rcd.

at 16,164, ¶ 162. As evidence of the Commission's alleged misjudgment, NTCH references events that occurred *after* the *AWS-4 Order*. 18-1243 NTCH Br. 30. Specifically, NTCH claims that Dish failed to meet its interim deadlines and that the Commission granted Dish's request for a one-year extension of the final deadline. *Id*. But NTCH's claim that the agency "turn[ed] out to be mistaken *ex post* is of limited significance," as we must "judge the reasonableness of an agency's decision on the basis of the record before the agency at the time it made its decision." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1107 (D.C. Cir. 2009). And though NTCH claims that the Commission's "blunder" was "actually quite apparent back in 2013," 18-1243 NTCH Br. 31, it musters as evidence a single comment that questions Dish's qualifications, 18-1243 J.A. 147 (comment of MetroPCS). Because the Commission's "predictive judgments" on this matter "are entitled to particularly deferential review," a single contrary comment does not render the agency's conclusion unreasonable. *See Earthlink*, 462 F.3d at 12 (internal quotation marks and alteration omitted).

Finally, NTCH claims that the Commission's failure to conduct an auction gave Dish an undeserved "windfall" and neglected to "recover[] for the public" a "portion of the value of the public spectrum resource." 18-1243 NTCH Br. 33–35 (citing 47 U.S.C. § 309(j)(3)). But the Commission retains the authority "to forgo an auction," so long as it acts "in the public interest." *M2Z Networks*, 558 F.3d at 563; *see also* 47 U.S.C. § 309(j)(6)(E). The Commission conceded the modifications would "result in an increase in value" for Dish, but nonetheless concluded that license modification was the "best and fastest method for bringing this spectrum to market." *AWS-4 Order*, 27 FCC Rcd. at 282, ¶ 178. These sorts of "judgments on the public interest are entitled to substantial judicial deference," *M2Z Networks*, 558 F.3d at 558 (internal quotation marks

omitted), and we see no reason to second-guess the Commission's decision to choose a functioning wireless broadband network over a possible influx of cash. We therefore decline NTCH's invitation to set aside the *AWS-4 Order*.

## C.

NTCH next argues that § 309(j) of the Communications Act required the Commission to auction off the terrestrial rights in the AWS-4 Band as "initial licenses." 18-1243 NTCH Br. 35–41; 47 U.S.C. § 309(j)(1). Specifically, it claims that an initial license is one "first awarded for a particular frequency under a new licensing scheme, that is, one involving a *different set of rights and obligations for the licensee*." 18-1243 NTCH Br. 37–38 (quoting *Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 970 (D.C. Cir. 1999) (emphasis added)). NTCH believes that, because the AWS-4 rights give Dish a "different set of rights and obligations," § 309(j) compels the Commission to allocate them through a public auction. 18-1243 NTCH Br. 37–38.

NTCH misunderstands the structure of the Communications Act. The Commission must conduct an auction only if it accepts "mutually exclusive applications" for initial licenses, 47 U.S.C. § 309(j)(1), but the Communications Act also states that nothing in § 309(j) shall "be construed to relieve the Commission of the obligation in the public interest to continue to use engineering solutions, negotiation, threshold qualifications, service regulations, and other means in order to *avoid* mutual exclusivity in application and licensing proceedings," *id.* § 308(j)(6)(E) (emphasis added); *see also M2Z Networks*, 558 F.3d at 562–63. In this case, because the Commission never accepted "mutually exclusive applications," it wasn't obligated to conduct an auction. NTCH nevertheless claims that our decision in *Fresno Mobile Radio*

requires the Commission to treat the AWS-4 rights as "initial licenses." 18-1243 NTCH Br. 37–40. But *Fresno Mobile Radio* compels no such thing. There, we held that the Commission reasonably chose to treat certain spectrum rights as initial licenses, rather than to allocate them to the incumbent licensees, because the licenses included "a different set of rights and obligations." 165 F.3d at 970–71. But a holding that the Commission *may* treat a "different set of rights and obligations" as initial licenses provides no support for NTCH's contention that the Commission *must* do so.

**D.**

Finally, NTCH argues that the Commission's decision to modify Dish's licenses exceeded its authority under § 316 of the Communications Act. 47 U.S.C. § 316(a). Under that provision, the Commission enjoys "broad power to modify licenses" if those modifications "serve the public interest, convenience and necessity." *California Metro Mobile Communications, Inc. v. FCC*, 365 F.3d 38, 45 (D.C. Cir. 2004). But the Commission's "power to modify existing licenses does not enable it to *fundamentally change* those licenses." *Cellco Partnership v. FCC*, 700 F.3d 534, 543-44 (D.C. Cir. 2012) (internal quotation marks omitted and emphasis added); *see also Community Television, Inc. v. FCC*, 216 F.3d 1133, 1140-41 (D.C. Cir. 2000) (same).

NTCH insists that the Commission's changes to Dish's licenses were so "fundamental" that they go beyond its modification authority under § 316. 18-1243 NTCH Br. 41-44. We need not address this argument, however, because NTCH failed to raise it until its petition for reconsideration. Generally, a challenger "forfeit[s] an opportunity to challenge an agency rulemaking on a ground that was not first presented to the agency for its initial consideration." *Advocates for Highway &*

*Auto Safety v. Federal Motor Carrier Safety Administration*, 429 F.3d 1136, 1150 (D.C. Cir. 2005); *see also Washington Ass'n for Television & Children v. FCC*, 712 F.2d 677, 681 (D.C. Cir. 1983) (noting that the provision authorizing review of Commission decisions "codif[ies] the judicially-created doctrine of exhaustion of administrative remedies"). As NTCH concedes, nowhere in its comments on the *AWS-4 NPRM* did it challenge the Commission's authority under § 316 to modify Dish's licenses. 18-1243 J.A. 404, ¶ 15. In denying NTCH's petition for reconsideration, the Commission dismissed NTCH's argument because its belated objection "frustrate[d]" the Commission's ability to "address [it] during the course of the rulemaking." *Id.* at 405, ¶ 15.

NTCH offers two rejoinders, but neither has merit. First, NTCH claims that *Dish*'s comments regarding § 316 preserved *NTCH*'s argument for our review. Dish argued that the Commission lacked § 316 authority to force Dish "to relinquish MSS or terrestrial rights to its spectrum," 18-1243 J.A. 206–207—in other words, to do exactly as NTCH suggested. But Dish's objection that the Commission could not unilaterally *abolish* its satellite or terrestrial rights hardly preserves NTCH's contention that the Commission lacked authority to *authorize* stand-alone terrestrial services. 18-1243 NTCH Br. 41–44.

Second, NTCH claims that the Commission *did* consider its argument, so NTCH may address the issue here without "sandbagging" the Commission. 18-1243 Reply Br. 10. True enough, the Commission alternatively rejected NTCH's § 316 argument on the merits. 18-1243 J.A. 404–06. But the Commission's thoroughness does not salvage NTCH's forfeited claim. We will not grant "relief on the merits" when the Commission has "*properly* dismissed the pleading on procedural grounds." *BDPCS, Inc. v. FCC*, 351 F.3d 1177,

1183 (D.C. Cir. 2003). Because the Commission correctly treated NTCH's claim as procedurally barred, "we have no occasion to reach the merits." *Id.* at 1184.

\* \* \*

Because none of NTCH's challenges to the *AWS-4 Order* has merit, we deny its petition for review.

## III.

This brings us, finally, to NTCH's challenges to the order granting Dish's request for a waiver of certain AWS-4 rules and to the Auction 96 procedures. We consider each in turn.

## A.

We begin with the Commission's dismissal of NTCH's application for review of the Bureau's order granting Dish's waivers. *In re Dish Network Corp.*, 33 FCC Rcd. 8456 (2018).

Under § 5(c)(4) of the Communications Act, NTCH may only seek review of the waiver if it was "aggrieved" by the Commission's action. The Commission interprets "aggrieved" in § 5(c)(4) to impose the "Supreme Court's test for constitutional standing." *Id.* at 8460 n.42. In this case, the Commission concluded that NTCH lacked administrative standing because it failed "to demonstrate any direct causal link" between the waiver and "any actual or concrete injury to NTCH." *Id.* at 8461, ¶ 13. NTCH claimed that the Bureau's grant of the waivers "thwarted" its plans to participate in the H Block auction by skewing the auction in Dish's favor, but the Commission determined that NTCH "made a voluntary, business decision not to participate in the auction . . . *prior* to the" Bureau's order. *Id.* As the Commission concisely says on

appeal, NTCH "proximate[ly] cause[d]" its own injury by choosing not to bid. 18-1241 FCC Br. 59.

The Commission misunderstood NTCH's alleged injury. NTCH claims that the Commission deprived it not of a license itself, but rather of a fair and valid auction process. As discussed, such a claim "asserts a cognizable injury." *U.S. AirWaves, Inc. v. FCC*, 232 F.3d 227, 232 (D.C. Cir. 2000); *see also DIRECTV*, 110 F.3d at 830, even if the prospective bidder "voluntarily withdr[aws]" from the unfair auction. *Alvin Lou Media*, 571 F.3d at 7.

The Commission responds, correctly, that NTCH withdrew from the auction *before* Dish received the challenged waivers. But under our caselaw, the Commission still caused NTCH's harm. In *Airwaves*, we held that a disappointed bidder had standing to seek reconsideration of an auction, despite "challeng[ing] only the way in which the Commission treated licensees *after* the auction was completed." 232 F.3d at 232. The Commission's actions still caused that injury because the bidder "would have bid more had it known that financial terms more favorable than those announced at the time of the auction would later be offered to winning bidders." *Id.* Much like the challenger in *Airwaves*, NTCH has standing because it "would have" participated in Auction 96 if it had not anticipated that the Commission's grant of the waivers would skew the auction in Dish's favor.

We therefore vacate the Commission's order dismissing NTCH's application for review. But because the Commission never reached the merits of NTCH's challenge to the waiver, neither shall we. Having concluded that the Commission erred in its threshold analysis, we "remand to the agency for additional investigation or explanation." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

**B.**

NTCH also sought Commission review of the Bureau's Auction 96 procedures. The Commission denied NTCH's application for review both on procedural grounds and on the merits. *In re NTCH, Inc.*, 33 FCC Rcd. 8446 (2018). Because NTCH has failed to show that the Commission's decision was arbitrary or capricious, we deny the petition for review.

As a threshold issue, the Commission again challenges NTCH's standing. The Commission argues that NTCH cannot assert an Article III injury because the reserve price "did not hinder NTCH's ability to compete for licenses." 18-1241 FCC Br. 34. Specifically, the Commission claims that the *aggregate* reserve price presented no bar to NTCH competing for *specific* licenses within the H Block. *Id.* at 34–35. Once again, the Commission betrays a cramped view of NTCH's asserted injury. As discussed, the deprivation of a "valid procurement process," *Airwaves*, 232 F.3d at 232, constitutes an independent Article III injury, distinct from NTCH's ultimate failure to obtain a license. And because NTCH traces that deprivation to the Commission's adoption of Dish's proposed reserve price—a price that, in NTCH's view, skewed the auction mechanics—NTCH has standing to challenge the auction procedures.

Turning now to the merits, the Commission dismissed NTCH's application for review of the Bureau's order because NTCH failed to comply with the Commission's procedural rules. Under such rules, an application for review must "specify with particularity" why—selecting from five factors—the Bureau's order warrants the full Commission's review. 47 C.F.R. § 1.115(b)(2). The Commission concluded that NTCH failed to do so. *In re NTCH, Inc.*, 33 FCC Rcd. 8446, 8450, ¶ 11 (2018). We review this "dismissal of

pleadings on procedural grounds under the familiar standards of the Administrative Procedure Act," *BDPCS*, 351 F.3d at 1183, and we find the Commission's decision reasonable.

Under a header entitled "Factors Warranting Commission Consideration," NTCH cited three errors: (1) the reserve price was set "contrary to precedent" and was "unsupported by the facts of record," (2) "adopting a reserve price based on a deal with a potential auction bidder [wa]s unprecedented," and (3) the Bureau's action "constitute[d] a prejudicial procedural error." 18-1241 J.A. 269. NTCH's asserted errors parrot the factors in the Commission's rules, but the agency found that NTCH identified no "statute, regulation, case, precedent, or established Commission policy (or any evidence of record)" undermining the Bureau's decision. *In re NTCH, Inc.*, 33 FCC Rcd. 8,446, 8,450–51, ¶ 11 (2018). Likewise, NTCH identified no "concrete harm or prejudice it may have suffered" from the alleged procedural error. *Id*. In other words, NTCH alleged "unprecedented" action and "prejudicial" error without citing precedent or showing prejudice.

NTCH responds that the Commission's rules require it only "to identify briefly" which factors from the "menu of five possible choices" justify review. 18-1241 Reply Br. 14. NTCH thinks it cleared this "minor hurdle" because it "carefully and explicitly laid out" specific factors. *Id*. But again, NTCH cites no authority supporting its assertion, and we've said in a similar context that the Commission "need not sift pleadings and documents to identify arguments that are not stated with clarity." *Bartholdi Cable Co., Inc. v. FCC*, 114 F.3d 274, 279 (D.C. Cir. 1997) (internal quotation marks omitted). Given the "highly deferential standard" we apply under arbitrary and capricious review, *Cellco Partnership*, 357 F.3d at 93, NTCH has given us no basis to conclude that the agency's dismissal was improper. Because the Commission acted lawfully, "we

have no occasion to reach the merits." *BDPCS*, 351 F.3d at 1184.

Finally, in its briefs before this court, NTCH argued that we should set aside Auction 96 because it resulted in Dish bidding on not just the H Block licenses, but on the value of spectrum licenses *plus* the waivers. NTCH compares the bidding to an auction where "the auctioneer has a side deal with one bidder that if she is the winning bidder on ten cars, she will be given a brand new Cadillac," and, "[u]nder textbook economic theory," that arrangement skews the auction. 18-1241 NTCH Br. 44–45. Though NTCH's example is evocative, we cannot consider it. As NTCH conceded at oral argument, it failed to raise this argument before the Commission. Oral Arg. Tr. (No. 18-1241) 37:10–14. Accordingly, it is forfeited. *See Advocates for Highway & Auto Safety*, 429 F.3d at 1150. We therefore deny NTCH's petition for review.

## IV.

For the reasons given above, we deny NTCH's petitions for review of both the initial order modifying Dish's AWS-4 licenses and the order setting the Auction 96 procedures. Because the Commission wrongly dismissed NTCH's application for review of the Bureau's grant of the waivers, however, we vacate the Commission's order and remand to the Commission to consider those claims in the first instance.

*So ordered.*